## S97P0285. THOMASON v. THE STATE.
### (486 SE2d 861)

SEARS, Justice.

Following a three-day bench trial, appellant Gary Chad Thomason was convicted of malice murder, burglary, and possession of a firearm by a felon during the commission of a burglary.[1] The trial court sentenced Thomason to death for the murder conviction, finding as statutory aggravating circumstances that the murder was committed during the commission of a burglary, and for the purpose of obtaining money and things of monetary value.[2] On appeal, we find that the trial court properly denied Thomason's motion to suppress certain evidence, because the searches and seizures that precipitated the collection of such evidence were permissible. We also find that the trial court properly admitted into evidence two eyewitness identifications of Thomason, made as he fled the murder scene,

---

[1] The crimes occurred on August 21, 1992, and Thomason was originally indicted later that same year. That original indictment was nolle prossed, and on May 3, 1993, Thomason was re-indicted for malice murder, felony murder, two counts of burglary, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon. On May 2, 1995, a jury found Thomason mentally competent to stand trial. On September 27, 1996, Thomason filed a waiver of his right to a jury trial on the indicted charges. On September 30, 1996, through October 3, 1996, Thomason was tried without a jury before the Hon. F. Larry Salmon of the Floyd County Superior Court. On October 3, 1996, Thomason was found guilty of malice murder and felony murder, with the felony murder conviction merging into the malice murder conviction by operation of law, two counts of burglary, possession of a firearm during the commission of a burglary, and possession of a firearm by a convicted felon. On October 3, 1996, Thomason was sentenced to death for the malice murder conviction, twenty years for each count of burglary, and five years for each of the two firearm convictions, each term of years to run consecutively. The transcript was certified by the court reporter on November 4, 1996. No motion for new trial was filed. A notice of appeal was timely filed in the superior court on November 1, 1996. The appeal was docketed in this Court on November 13, 1996, and orally argued on March 10, 1997.

[2] OCGA § 17-10-30 (b) (2), (4).

because no substantial likelihood of misidentification existed. Furthermore, to the extent that the trial court failed to follow the procedures delineated in the Unified Appeal Procedure, no reversible error occurred. Finding no error associated with the remaining enumerations raised on appeal, we affirm.

Evidence was introduced at trial showing that shortly before noon on August 21, 1992, Floyd County police officers received an emergency telephone call from Jerry Self. Self, who called the police on his cellular phone, reported that upon driving into the driveway of his home, he had discovered an unfamiliar Oldsmobile Cutlass parked in the carport. Officers Corbin and Logan responded to Self's emergency call, and as they approached the Self residence, they drove slowly in order to see the house numbers. Because it was raining heavily, the officers rolled down the patrol car's windows in order to better observe the house numbers. As they came within 100 yards of the Self residence, Officers Corbin and Logan saw and heard an automobile approaching them from the direction of the Self residence. As the two cars approached one another, the officers observed that the other car was a light brown 1978 or 1979 model Oldsmobile Cutlass, with a lighter brown top, that was traveling approximately thirty miles an hour, and was accelerating. The officers testified that, as the two cars passed one another, the driver of the Oldsmobile looked directly at them, and they observed that the driver was a white male with brown curly hair, and that he was wearing a black baseball cap.

The officers continued to the Self residence, and, upon pulling into the driveway, they saw a body lying on the ground, later identified as Self. He had been shot several times, and was dead when the officers arrived. Self's truck was found in front of the house, with the engine still running. The side window of the truck had been broken, and there was blood on the front seat. A window on the front of the Self residence had been broken, and the house had been burglarized. It was later discovered that earlier that same day, another house on the same street, the Blaylock residence, had been burglarized in a similar manner.

Local police were alerted to be on the lookout for a brown 1978 or 1979 Oldsmobile Cutlass, described as being "not as dark [brown] as the sheriff department's cars," with a lighter brown top, being driven by a white male. Shortly thereafter, a vehicle and driver matching that description were seen leaving a convenience store in nearby Calhoun. After following the Cutlass for approximately five minutes, City of Calhoun police officer Gilbert stopped the car, which was being driven by appellant Thomason. Thomason was asked to step out of the vehicle, and was "patted down" by the officer. The officer discovered a cigarette lighter in Thomason's pocket, which he

returned to Thomason. Officer Gilbert observed that Thomason's clothing was soaking wet, even though it had only just begun to rain very lightly in the Calhoun area, and that Thomason's shirt appeared to have blood stains on it. After Thomason consented to a search of the Cutlass, Officer Gilbert also observed crumpled currency on the car's console that appeared to have fresh blood on it. Officer Gilbert then handcuffed Thomason and placed him in the back of Gilbert's patrol car.

A sergeant with the Floyd County Police Department arrived on the scene, and was shown the blood stains on the currency and on Thomason's shirt. The sergeant cut a piece of the blood-stained material off Thomason's shirt tail and placed it in a plastic bag. At that point, Thomason was placed in the back of the Floyd County sergeant's patrol car. Before doing that, however, the sergeant conducted a second "pat down" of Thomason, and in so doing, discovered that the lighter in Thomason's pocket was engraved with the murder victim's name. He also discovered a ring and two gold chains in Thomason's pocket, both of which were later determined to have been taken in the Blaylock burglary. The Oldsmobile Cutlass was taken to a nearby holding facility.

Approximately 45 minutes after Thomason was stopped, Officers Logan and Corbin arrived on the scene, and identified Thomason as the individual they had seen driving away from the Self residence. They later identified the Oldsmobile Cutlass as the car they had observed accelerating away from the crime scene. Several items discovered in the Cutlass were identified as having been taken from the Self and Blaylock residences. It was determined that Self had died from three gunshot wounds, each made with a .38 caliber-type bullet. Among the items missing from the Self residence following the burglary was a .357 magnum pistol, which sometimes was loaded with .38 caliber ammunition.[3] Laboratory analyses later determined that the blood stains on Thomason's shirt matched Self's blood.

1. Viewed most favorably to the verdict, we determine that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Thomason was guilty of the crimes for which he was convicted.[4]

2. Thomason argues that the trial court erred in denying his motion to suppress evidence gathered as a result of the State's warrantless seizures and searches of him and his car. In making this argument, Thomason claims that Officer Gilbert's investigatory stop of him was not based upon reasonable and articulable suspicion, and

---

[3] The murder weapon, however, never was recovered.

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

thus was illegal. Thomason also argues that even if the investigatory stop was legal, the subsequent search of the Cutlass exceeded the bounds of such a stop, and was not otherwise permissible. Thomason further alleges that his seizure was not based upon probable cause, and that the police search of his person was unreasonable. We will address each of these contentions in turn.

(a) Thomason argues that the investigative stop of him by Calhoun Police Officer Gilbert was impermissible, because it was not based upon specific and articulable facts that, when taken together with the rational inferences arising therefrom, provided the requisite reasonable suspicion to warrant the resulting intrusion.[5] It is established that, in making this determination, we examine whether the detaining officer had a particularized and objective basis for reasonably suspecting that the particular individual stopped was or had been engaged in criminal activity.[6]

Applying these principles to this case, we find that the initial stop of Thomason was based upon reasonable suspicion. Contrary to Thomason's argument, Officer Gilbert had more than a generalized description of the suspect he was seeking and the car he was driving. Officer Gilbert knew the color of both the car and its top, the manufacturer, model, and model year of the car, and the driver's gender and race. That detailed information was sufficient to provide Officer Gilbert with the requisite particularized basis to warrant the investigative stop of Thomason.[7]

The precedent relied upon by Thomason in arguing that the stop was not based on reasonable suspicion, *Vansant*, supra, is factually distinguishable. In *Vansant*, the investigating officer knew only that the suspect vehicle was a white van being driven in an intoxicated manner by a white male, and the officer admitted that he detained the suspect only because he was driving a white vehicle.[8] The officer in *Vansant* had no information to distinguish the van he stopped from all other white vans, such as its manufacturer, model, or model year. In contrast, Thomason's detention was initiated upon a much more particularized description of the suspect vehicle.[9] That specific and articulable information was sufficient to warrant Officer Gilbert's reasonable suspicion that the car and its driver were the sub-

---

[5] See *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968); *Vansant v. State*, 264 Ga. 319, 320 (443 SE2d 474) (1994).

[6] *United States v. Cortez*, 449 U. S. 411, 417-418 (101 SC 690, 66 LE2d 621) (1981).

[7] See *Hestley v. State*, 216 Ga. App. 573, 574 (455 SE2d 333) (1995) (reasonable suspicion found where investigative stop was premised upon description that suspect vehicle was a white panel van without many windows believed to be a Chevrolet).

[8] *Vansant*, 264 Ga. at 321.

[9] See id. (indicating that a particularized description of a suspect vehicle may, in addition to other factors, provide the requisite basis for an investigative stop by police).

jects of the lookout request generated by Floyd County police, and thus warranted the investigative stop.

(b) Thomason argues that, even if the investigative stop was supported by reasonable suspicion, the subsequent warrantless search of his car exceeded the limits of an investigative stop, and was not based upon either probable cause or exigent circumstances, thus rendering it illegal. However, it is undisputed that, after Officer Gilbert initiated the investigative stop of Thomason and appropriately conducted a "pat-down" in order to search for weapons, he sought and received Thomason's consent to search the Cutlass' interior. While the State carries the burden of proving that Thomason freely and voluntarily consented to the search,[10] inherent in the trial court's findings supporting the denial of the motion to suppress is the finding that consent to the search was made voluntarily.[11] Our own review of the record leads us to the same conclusion. Voluntariness of consent is considered from all of the circumstances,[12] and none of the facts attendant to this claim indicate that Thomason's consent to the search of his car was the result of coercion, duress or any other impermissible factor. Insofar as the investigatory stop of Thomason was lawful, it did nothing to taint the subsequent search of the car's interior. Because valid consent to search the interior of Thomason's car existed, the need for either probable cause or a search warrant was eliminated.[13]

(c) In addition to observing the bloody currency on the Cutlass' console and the blood stains on Thomason's shirt, Officer Gilbert queried Thomason on why his clothes were soaking wet, when only a light rain was falling in the area. Thomason gave an implausible response to this question. Officer Gilbert testified at the hearing on the motion to suppress that at the time he asked this question, he knew that it was raining heavily in Floyd County, where the murder occurred, and suspected that Thomason may have come from that direction before being stopped. It was after all of this information was gathered that Thomason was handcuffed and placed in the back

---

[10] *Schneckloth v. Bustamonte*, 412 U. S. 218, 222 (93 SC 2041, 36 LE2d 854) (1973); *Hestley*, 216 Ga. App. at 575.

[11] See *Hestley*, supra; *Garcia v. State*, 195 Ga. App. 635, 637 (394 SE2d 542) (1990).

[12] *Schneckloth*, 412 U. S. at 226.

[13] Id., 412 U. S. at 222. Nor is there any merit to Thomason's contention that evidence seized as part of a search of the Cutlass after it was taken into custody should have been suppressed because no warrant was obtained before such search. When police officers have probable cause to suspect that there is evidence of a crime inside an automobile that has been stopped on the road, they may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody. *Michigan v. Thomas*, 458 U. S. 259, 261 (102 SC 3079, 73 LE2d 750) (1982). See *South Dakota v. Opperman*, 428 U. S. 364 (96 SC 3092, 49 LE2d 1000) (1976); *Chambers v. Maroney*, 399 U. S. 42, 47-49 (90 SC 1975, 26 LE2d 419) (1970).

of Gilbert's patrol car. Thomason argues that his seizure constituted an illegal arrest, because Officer Gilbert did not recover any incriminating evidence during his "pat down" of Thomason.

Obviously, at the point where he was handcuffed and placed in the back of the patrol car, Thomason was in custody and not free to leave the scene. However, we believe that Thomason's seizure was permissible. In addition to the information he gathered after initiating the investigative stop, Officer Gilbert knew at the time he placed Thomason in custody that both Thomason and the car he was driving matched the description of the car and driver seen leaving the scene of the murder. That degree of knowledge, considered in its entirety, would justify a person of reasonable caution to believe it probable that an offense had been committed, and thus provided the probable cause required to take custody of Thomason.[14]

(d) Finally, we reject Thomason's claim that the evidence gathered from his person should have been suppressed. The lighter and jewelry discovered in his pocket were seized as part of a search incident to a lawful arrest, conducted at the time Floyd County officers took custody of Thomason.[15] The blood-stained piece of Thomason's shirt was in plain view at the time of the search incident to arrest,[16] and was removed and placed in a protective bag in order to preserve evidence, as it had begun to rain rather heavily at the scene.[17] Likewise, swabs of blood were permissibly taken from Thomason's skin surface after he was taken into custody, as they also preserved evidence. Thomason concedes that before samples of his own blood were withdrawn, a valid warrant was obtained.

For all of these reasons, we reject Thomason's argument that the trial court erred by denying his motion to suppress evidence.

3. Thomason claims that the trial court erred in denying his motion to suppress Officers Corbin's and Logan's testimony identifying him as the individual they observed driving the Oldsmobile Cutlass away from the murder scene. Thomason claims that (1) the conditions attending the officers' first sighting of Thomason created a substantial likelihood of misidentification, and (2) unnecessarily suggestive procedures corrupted the officers' identification of Thomason after he had been taken into police custody.

Factors to be considered in determining the admissibility of eyewitness identifications include (1) the witness's opportunity to view

---

[14] See *Lewis v. State*, 255 Ga. 101, 104 (335 SE2d 560) (1985).

[15] See *United States v. Robinson*, 414 U. S. 218 (94 SC 467, 38 LE2d 427) (1973); *Preston v. United States*, 376 U. S. 364, 367 (84 SC 881, 11 LE2d 777) (1964).

[16] See *Horton v. California*, 496 U. S. 128, 135 (110 SC 2301, 110 LE2d 112) (1990).

[17] See *Cupp v. Murphy*, 412 U. S. 291 (93 SC 2000, 36 LE2d 900) (1973) (in order to prevent the destruction of evidence, a limited and warrantless intrusion may be permitted).

the accused at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the accused; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the confrontation.[18]

The officers admitted that, as their patrol car approached Thomason's Cutlass, heavy rain on the patrol car's windshield obscured their vision. However, the officers also testified that they had rolled down both their driver- and passenger-side windows in order to see more clearly. As the Cutlass passed the patrol car, its driver-side window also was rolled down. The officers testified that the two cars passed within several feet of one another, and that as the cars passed, Thomason and the officers looked at each other "eye to eye" through the open windows for three to five seconds. Knowing that they were near the Self residence, where the emergency call they were responding to had originated, and that the Cutlass was accelerating from that direction, the officers had stated to one another that they should pay extremely close attention to the driver of the Cutlass as he passed. Under these circumstances, we reject Thomason's contention that there was a substantial likelihood of misidentification associated with the officer's first sighting of him.[19]

Officers Logan's and Corbin's identification of Thomason after he was taken into custody also was reliable. The officers' initial description of Thomason to the radio dispatcher, made before their identification of him, was accurate. Moreover, after speaking with the dispatcher, the officers radioed a more detailed description of Thomason to the Calhoun police officers who were holding Thomason, and that description also was accurate. At the "show up," which took place no more than one hour after the officers first saw Thomason, the officers were entirely confident that it was Thomason they had seen leaving the murder scene. Thus, all of the *Biggers* criteria for establishing the reliability of an eyewitness identification are satisfied in this case.

Nor does the record support Thomason's claim that the officers' identification of him after he was taken into custody was tainted by impermissibly suggestive procedures. Thomason claims that radioed communications between Calhoun police officers and Floyd County officers Corbin and Logan corrupted the "show up" identification pro-

---

[18] *Neil v. Biggers*, 409 U. S. 188, 199 (93 SC 375, 34 LE2d 401) (1972).

[19] See, e.g., *Biggers*, 409 U. S. at 200 (even under adequate artificial light and moonlight, where the witness's frontal view of the suspect was made under attentive circumstances, there was no substantial likelihood of misidentification). Nor do we give credence to Thomason's claim that the officers' inattention is demonstrated by the fact that they did not observe the license tag number on the Cutlass. The officers testified that the rain obscured their view out of their patrol car's rear window, and thus they could not have seen the tag number as the Cutlass drove away.

cedure. After Calhoun police stopped Thomason, they radioed Corbin and Logan and asked them to describe the man they were seeking. Corbin and Logan did so, in slightly more detail than they had done initially to the police dispatcher. Calhoun police then responded "we've got him," and confirmed that Corbin and Logan should proceed to the "show up" identification. We reject Thomason's argument that the single statement "we've got him" was so impermissibly suggestive to have swayed Thomason's identification by two trained law enforcement officers who had plainly viewed him leaving the scene of a crime less than one hour earlier. Rather, our reading of the transcript of the radioed communications indicates that the Calhoun police officers' statement merely confirmed that a suspect was being held who matched the lookout description, and that Officers Logan and Crawford should proceed to either confirm or deny that the proper individual had been apprehended.

4. Thomason argues that his conviction must be reversed because the trial court erred by failing to follow several procedures delineated in the Unified Appeal Procedure ("UAP"). The record on appeal shows that while the trial court complied with virtually all of the UAP's directives, it erred procedurally by not complying with several key portions of the UAP. However, we determine that Thomason suffered absolutely no harm as a result of the trial court's actions, and thus no reversible error exists.

(a) The UAP requires the trial court to review section one of the UAP checklist with counsel for both sides at the "first proceeding," to determine what pre-trial issues the defense intends to raise, to schedule hearings on any such issues, and to remind counsel that any such issues not timely raised may be waived.[20] Examples of the types of pre-trial issues included in section one of the UAP checklist are challenges to the grand and traverse jury pools, and search and seizure challenges. Thomason claims that the trial court committed reversible error by not reviewing the UAP checklist with counsel at the first proceeding, and by not scheduling a later conference in order to review the issues set forth in the checklist.

Our review of the transcript of the first proceeding[21] shows that Thomason was represented by new counsel at that proceeding, and that at the first proceeding, counsel requested that the trial court "start from scratch," and "follow the normal procedure in a death penalty case." The transcript also indicates that at the first proceeding, copies of the UAP checklist were provided to counsel for both sides, and defense counsel informed the trial court that he could not

---

[20] See UAP § II (A) (8) (set forth in the Georgia Court and Bar Rules, Ch. 9 (1989)).

[21] We refer here to the first proceeding held on the second indictment issued against Thomason, as the State did not proceed on the first indictment. See n. 1, supra.

state at that time whether he intended to challenge the jury pools,[22] as he had only recently been retained and was not entirely familiar with the case. From this, we find that it was reasonable for the trial court to conclude that defense counsel could not state with any certainty what pre-trial issues included in the checklist he intended to raise. We also note that at the first proceeding, the trial court instructed that, because of defense counsel's late entry into the case, any motions that should have been filed before the first proceeding would be accepted within ten days thereafter, and that all timely-filed motions would be heard and promptly ruled upon.[23] Finally, we note that subsequent to the first proceeding, Thomason filed motions pertaining to a great many of the issues set forth in section one of the UAP checklist, and that all of those motions were heard and ruled upon by the trial court. These factors convince us that, while the trial court erred procedurally by not reviewing section one of the UAP checklist with counsel at the first proceeding in order to determine what pre-trial issues would be raised, that action did not prevent Thomason from having a full opportunity to raise those issues and have them decided by the court. Thus, as no harm resulted from the trial court's actions, no reversible error exists.[24]

The record shows that a great number of conferences on pre-trial issues were scheduled and held by the trial court, and that several such conferences were conducted ex parte at the request of defense counsel. Thus, we reject Thomason's claim that the trial court did not afford him sufficient opportunity to raise the pre-trial issues at court-scheduled conferences.[25]

(b) Thomason incorrectly asserts that the trial court erred by not inquiring of him at the first proceeding whether he had any objection to his counsel's handling of his defense.[26] The transcript of the first proceeding, however, shows that the trial court did make this inquiry, and that Thomason replied he was satisfied with his counsel.

(c) Regarding the trial court's hearing on Thomason's pre-trial motions, Thomason complains that the trial court failed to (1) review section one of the UAP checklist with counsel for both sides, and determine whether there were potential pre-trial issues not raised

---

[22] See UAP § II (A) (5).

[23] The transcript also reveals that at the first proceeding, defense counsel informed the trial court that he intended to file a motion challenging Thomason's competency to stand trial, and urged that certain other pre-trial issues should not be addressed until the competency issue was resolved by a special jury. See Division 5, infra.

[24] *Bryant v. State*, 236 Ga. 790 (225 SE2d 309) (1976); see *Anderson v. State*, 258 Ga. 70 (365 SE2d 421) (1988).

[25] See also Division 4 (c), infra.

[26] See UAP § II (A) (7).

that should have been raised,[27] and (2) inquire whether defense counsel had explained to Thomason his rights regarding any issue not raised.[28] The transcript shows that at the motions hearing, the trial court did not review the UAP checklist with counsel, and did not inquire of Thomason whether he had discussed issues not raised with his counsel. However, at the hearing, the trial court heard, considered and ruled upon over 40 pre-trial motions. Thomason did not aver at the motions hearing, nor does he argue on appeal, that the trial court's failure to comply with these two directives of the UAP prevented him from raising any meritorious pre-trial issue that could have been asserted. Moreover, on several occasions both during and following the motions hearing, the trial court inquired of Thomason whether he was satisfied with his counsel's performance, and each time he responded affirmatively. These factors convince us that, while the trial court did err procedurally by not complying with the precise directives of section II (B) (2) of the UAP, no harm resulted therefrom, rendering the error harmless.

(d) We reject Thomason's assertion that the trial court improperly ruled that his pre-trial motions were untimely because they were not filed before his arraignment. The transcript shows that, during the motions hearing, the trial court commented that because Thomason's pre-trial motions should have been filed before his arraignment, they appeared to be untimely. Nonetheless, the trial court went on to hear arguments on each pre-trial motion filed, to consider the merits of each such motion, and to rule upon each motion based upon its merits. Thus, contrary to Thomason's assertion, the trial court did not dispose of his pre-trial motions simply by ruling that the motions were untimely, and this enumeration is rejected.

In conclusion, our review of the entirety of the pre-trial proceedings confirms that while the trial court erred procedurally by not complying with all of the precise directives of the UAP, it nonetheless accomplished the purpose of the UAP by taking steps designed to ensure that all legal issues that should have been raised were raised, considered upon their merits, and ruled upon.[29] On appeal, Thomason does not claim that the trial court's procedural errors prejudiced him in any manner. Rather, he simply claims that the procedural errors, standing alone, mandate reversal. Because it is irrefutable that error without resulting prejudice is harmless, we conclude that

---

[27] Thomason also claims that the trial court erred by not conducting this review following the motions hearing but before trial. However, the UAP does not impose this obligation on the trial court.

[28] See UAP § II (B) (2).

[29] See UAP § I (A) (1).

the pre-trial procedural irregularities complained of in this case do not warrant a new trial.

5. Thomason claims that the trial court erred by requiring him to enter a plea prior to determining his competency to stand trial. At the first appearance of counsel, the trial court was informed that Thomason intended to challenge his competency to stand trial, and would be requesting that a special jury determine that issue. Thomason's arraignment subsequently was scheduled, and at the arraignment, Thomason objected that being required to enter a plea before the issue of his competency was resolved violated the rule set forth in *Martin v. State*[30] that an accused cannot be forced to enter a plea while the issue of his competency to stand trial remains unresolved. However, at the arraignment, Thomason did not enter a plea. Rather, at the trial court's invitation, he opted to stand mute, and, at the trial court's direction, a not guilty plea was entered by the clerk of the court on Thomason's behalf. It being undisputed that Thomason was not forced to enter a plea before the issue of his competency was determined, there was no violation of the principle set forth in *Martin*, supra, and this enumeration is rejected.[31]

6. Thomason filed an ex parte motion seeking funds of between $17,000 and $20,000 with which to employ an expert in the field of DNA analysis, and between $18,000 and $24,000 with which to employ an expert forensic pathologist. In his ex parte motion, Thomason explained (1) that the services of a DNA expert were necessary for him effectively to rebut the State's case against him, which would rely primarily upon the State's DNA analyses of blood samples taken from the crime scene, the victim, and Thomason, and (2) that he required the services of an expert forensic pathologist because "the absence of certain physical evidence at the scene, along with the nature of other evidence identified [by the State] tends to establish . . . [his] innocence."

An ex parte hearing was initiated on this motion, at which the trial court stated that it was greatly concerned about the approximately $40,000 in fees that Thomason had requested to employ these two experts. The trial court candidly admitted that, due to its lack of investigative resources, it could not make an intelligent decision on whether the fees sought were reasonable. In order to develop additional facts concerning the reasonable costs of the expert services

---

[30] 147 Ga. App. 173 (248 SE2d 235) (1978).

[31] Moreover, we note that *Martin* is factually distinguishable from this case, as the appellant in *Martin* entered a plea of *guilty* while the issue of his competency remained unresolved, and the trial court accepted that plea and entered a sentence thereon. 147 Ga. App. at 173. In this case, of course, not only was Thomason not forced to enter any plea, a *not guilty* plea was entered on his behalf. Thus, the outstanding issue of Thomason's competency could not have adversely impacted the fair adjudication of his innocence or guilt.

sought, the trial court unsealed Thomason's ex parte motion for funds, and served it on the State for its response. At a subsequent hearing, the court inquired of the State what amount of fees it believed would, when objectively viewed, be reasonable for the expert services. After the State responded to that inquiry, it was excused from the courtroom, and the hearing on Thomason's motion was continued ex parte.

Thomason claims that the trial court erred by unsealing his ex parte motion seeking funds, because that action revealed his trial strategy to the State, without the State concomitantly revealing its strategy. It has long been recognized that an indigent defendant has a right to seek funds necessary to his meaningful participation in the judicial proceeding where his liberty and life are at stake.[32] While exercising that right, a defendant also has the right to maintain the secretive preparation of his defense.[33] For that reason, this Court has held that when attempting to make the showing required in order to obtain public funds for the services of a scientific expert,[34] a defendant cannot be placed in the position of "revealing his theory of the case,"[35] and thus has a legitimate interest in making that showing ex parte.[36] However, the trial court, in its discretion and without forcing a defendant to reveal his theory of the case, may reserve issues raised by an ex parte motion to be heard at a separate hearing at which the State is present.[37]

With these precepts in mind, we determine that the trial court's unsealing of Thomason's ex parte motion for funds did not improperly reveal his theory of the case. That Thomason sought to challenge the State's DNA testing, which had already been performed, cannot be considered a secretive trial strategy. Furthermore, the very general statement that Thomason sought to establish his innocence through "the absence of certain physical evidence at the scene, along with the nature of other evidence," standing alone, is so vague and inconclusive as to offer no insight into its specific meaning whatsoever. In this regard, we note that at the ex parte hearing, it was necessary for defense counsel to elaborate for the trial court rather extensively on what exactly was meant by this statement.

Regarding the hearing, considering that Thomason sought approximately $40,000 in funds with which to employ two scientific experts, we cannot say that the trial court erred by seeking addi-

---

[32] *Ake v. Oklahoma*, 470 U. S. 68, 76 (105 SC 1087, 84 LE2d 53) (1985); see *Brooks v. State*, 259 Ga. 562, 563-565 (385 SE2d 81) (1989).

[33] *Brooks*, 259 Ga. at 565.

[34] See *Roseboro v. State*, 258 Ga. 39, 41 (365 SE2d 115) (1988).

[35] *Brooks*, 259 Ga. at 566.

[36] Id.

[37] Id.

tional information from the State as to the reasonableness of that request. At the hearing, the trial court clearly stated that Thomason would not be required to reveal his trial strategy in the State's presence, and the transcript shows that so long as the State was present, the only issues discussed were the reasonable amount of fees that should be required for the expert services sought, the proper scope of such services, and what other experts had charged for the same or similar services. All matters touching on trial strategy were reserved until they could be heard ex parte. Under these facts, the trial court did not improperly place Thomason in a position where, in order to make the showing required for public funds with which to employ an expert, he had to reveal his theory of the case to the State. Therefore, we reject this enumeration.

7. The trial court did not abuse its discretion in denying Thomason's motions for funds with which to hire a crime scene reconstructionist and an expert forensic psychologist. An indigent's motion for the appointment of a defense expert should inform the trial court with reasonable precision why certain evidence is critical, what type of scientific testimony is needed, what that expert proposes to do regarding the evidence, and the anticipated costs for the services sought.[38] Absent discretionary abuse, a trial court's ruling on a criminal defendant's motion for the appointment of an expert witness will be upheld.[39]

In his motion, Thomason did not establish that the services of a crime scene reconstructionist were critical to his defense, and it is apparent that the absence of a reconstructionist did not render his trial fundamentally unfair.[40] Thomason had sought the appointment of an expert reconstructionist in order to "recreate the [crime] scene" and demonstrate inconsistencies in the State's theory of how the murder was committed. In presenting its theory as to how Thomason might have committed the murder, the State relied upon the testimony of a police captain. Thomason was granted funds by the trial court with which to hire a professional investigator, and we believe that the investigator's ability to evaluate the crime scene and draw conclusions regarding the murder's commission was the substantial equivalent of the State's witness.[41] Considering these circumstances, we conclude that Thomason has failed to establish that it was critical that he be granted additional funds to hire an expert crime scene reconstructionist in order to effectively rebut the State's theory. Accordingly, the trial court did not abuse its discretion in denying

---

[38] *Crawford v. State*, 267 Ga. 881, 883 (485 SE2d 461) (1997); *Roseboro*, 258 Ga. at 39.

[39] *Crawford*, supra; *Roseboro*, 258 Ga. at 41.

[40] See *Roseboro*, 258 Ga. at 41, n. 3.

[41] See id., 258 Ga. at 40.

the motion.

Nor did the trial court abuse its discretion in denying Thomason's request for funds with which to hire a forensic psychologist, Dr. Cheatum. Thomason asserts that he made a sufficient showing to entitle him to an independent psychiatric evaluation performed by Dr. Cheatum to assist his defense on the issues of Thomason's competency and mitigating evidence for sentencing purposes. Thomason's argument in support of this enumeration is incomplete and misleading. The record shows that after a competency evaluation was performed by a court-appointed expert, Thomason sought funds for an independent competency evaluation by Dr. Cheatum. The trial court granted Thomason $3,500 for that purpose, and Dr. Cheatum conducted an independent evaluation of Thomason. Thomason then sought an additional $25,000 for another psychological evaluation focused on his formative social and familial background. In response to that request, the trial court ordered Thomason to present further evidence of his need for the specific evaluation. To assist Thomason in gathering such evidence, the trial court issued an order providing him access to all of his official records. In an ex parte hearing, Thomason presented evidence from those official records, and the evidence presented failed to establish that the second psychological evaluation was critical to Thomason's defense.[42] Furthermore, we conclude that the absence of the second independent psychological evaluation did not render Thomason's trial fundamentally unfair. Thus, the trial court did not abuse its discretion in denying this motion.[43]

8. We reject Thomason's claim that the trial court erred by admitting into evidence samples of his blood and the blood of the victim. A review of the testimony and evidence shows that an adequate chain of custody was established with respect to the blood samples, that the samples were handled routinely, and that they were maintained properly in a sealed condition from the time of their collection through their delivery to the State Crime Laboratory. Nothing in the record raises a legitimate suspicion that the blood samples admitted into evidence were not the samples that were evaluated, and the record provides the requisite reasonable assurances of the samples' identities.[44]

9. The trial court did not abuse its discretion in refusing to sever

---

[42] At the ex parte hearing held to establish whether Thomason was entitled to the $25,000 in fees for a second psychological evaluation, Thomason presented evidence that he had received in-patient treatment for drug abuse and depression, that his elementary schooling was marked by difficulties in reading comprehension and spelling, and that an elementary school psychologist had attributed Thomason's learning difficulties to a nervous system disfunction and visual memory disorder.

[43] See *Isaacs v. State*, 259 Ga. 717, 724-725 (386 SE2d 316) (1989).

[44] See *Stephens v. State*, 259 Ga. 820 (388 SE2d 519) (1990).

four counts of the indictment relating to the burglary of the Blaylock residence and the possession of a firearm by a convicted felon. Evidence showed that all of the crimes with which Thomason was charged were committed within approximately one hour of each other, and constituted a series of acts performed as part of a single scheme or plan.[45]

10. As each count of the indictment stated the essential elements of the crime charged, and the indictment was sufficient to put Thomason on notice of the charges that he needed to defend against, the trial court properly denied Thomason's motion to quash.[46]

11. Georgia's death penalty statute is not unconstitutional for any of the reasons asserted by Thomason.[47]

12. The trial court did not abuse its discretion in denying Thomason's motions asking that each member of the defense counsel team be provided with a daily transcript of the trial court's proceedings. Not only has Thomason made no showing that the denial of these motions prejudiced his defense in any way, Georgia law requires only that counsel be provided with a copy of the transcript once proceedings are concluded and their transcription has been completed.[48]

13. The trial court did not abuse its discretion in denying Thomason's motion for notice by the State of its intention to use any evidence "arguably subject to a motion to suppress," as the law does require the State to make such a disclosure.

14. The evidence supports the finding of the statutory aggravating circumstances that the murder was committed during the course of a burglary and was committed for the purpose of obtaining money and things of monetary value.[49] The imposition of the death penalty in this case was not extreme or excessive in light of the facts of this case, and, as evidenced by the cases listed in the Appendix, is not disproportionate to the penalty imposed in other cases.

*Judgment affirmed. All the Justices concur, except Benham, C. J., who concurs in part and dissents in part.*

APPENDIX.

*Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Davis v. State*, 255 Ga. 588 (340 SE2d 862) (1986); *Horton v.*

---

[45] See *Davis v. State*, 263 Ga. 5, 6 (426 SE2d 844) (1993).

[46] See *Russell v. United States*, 369 U. S. 749, 763-764 (82 SC 1038, 8 LE2d 240) (1962).

[47] See *McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987); *Zant v. Stephens*, 462 U. S. 862 (103 SC 2733, 77 LE2d 235) (1983); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995). See also *Rower v. State*, 264 Ga. 323 (443 SE2d 839) (1994).

[48] See OCGA §§ 17-8-5; 5-6-41.

[49] OCGA § 17-10-30 (b) (2), (4).

*State,* 249 Ga. 871 (295 SE2d 281) (1982); *Amadeo v. State,* 243 Ga. 627 (255 SE2d 718) (1979); *Bowden v. State,* 239 Ga. 821 (238 SE2d 905) (1977); *Stephens v. State,* 237 Ga. 259 (227 SE2d 261) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975).

BENHAM, Chief Justice, concurring in part and dissenting in part.

Although I concur in the affirmance of Thomason's conviction for murder, I cannot concur in the affirmance of the death penalty imposed by the trial court following a trial without a jury. Contrary to the majority, I do not believe that a proportionality analysis supports affirmance of the sentence.

We are required by OCGA § 17-10-35 to conduct a review of the sentence in all death penalty cases, and specifically to consider "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." OCGA § 17-10-35 (c) (3). Because we are the only Georgia appellate court to review death penalty cases (Art. VI, Sec. VI, Par.. III, Ga. Const. 1983) and because the issue is one of enormous gravity, this weighty responsibility must be approached with special care in every case. Exacerbating the risk of a faulty proportionality analysis is the doctrine of stare decisis: if we lower the standard in a single case, that case becomes precedent for easier and easier imposition of the most extreme punishment available in criminal jurisprudence.

Bearing those considerations in mind, I have reviewed this case in the context of other murder convictions in which the conduct of the defendant was similar to that of Thomason in this case. It is evident from the facts set out in the majority opinion that Thomason was surprised in a burglary of the victim's home. Thus, there is evidence that the murder was committed in the course of a burglary and for the purpose of obtaining money and things of value. However, when considering this case in terms of proportionality, it is apparent that other defendants who have killed in the course of burglaries and other felonies, and whose crimes have thus met the same test for aggravating circumstances that Thomason's crime met, have not been subjected to our society's ultimate punishment: *White v. State,* 267 Ga. 523 (481 SE2d 804) (1997), defendant convicted of felony murder, armed robbery, and aggravated assault (defendant and two others used assault rifles to rob and then shoot four men, two of whom died), sentenced to consecutive terms of life imprisonment for each count of felony murder, and twenty years for each remaining count to be served concurrently; *Sterling v. State,* 267 Ga. 209 (477 SE2d 807) (1996), defendant convicted of malice murder, felony murder, aggravated assault, kidnapping and burglary (defendant and

accomplice forced their way into house of drug users and demanded money from victims who were then taken into the woods and shot, one fatally in the mouth and the other in the face), sentenced to life for the murder, a consecutive life term for aggravated assault, and two twenty-year concurrent terms for the kidnapping and burglary convictions; *LeMay v. State*, 265 Ga. 73 (453 SE2d 737) (1995), defendant found guilty of burglary, armed robbery, and murder (victim's home ransacked, several handguns taken as well as money and jewelry, and victim stabbed), received two life sentences for malice murder and armed robbery, and a consecutive twenty-year sentence for armed robbery (State sought the death penalty); *Henry v. State*, 265 Ga. 732 (462 SE2d 737) (1995), defendant convicted of malice murder, armed robbery, and kidnapping with bodily injury (defendant robbed jewelry store, shot owner in the head), sentenced to life imprisonment without parole for the murder, and to consecutive life sentences for the armed robbery and kidnapping; *Edwards v. State*, 264 Ga. 615 (449 SE2d 516) (1994), defendant found guilty of malice murder, armed robbery, and burglary (operator of a motel fatally stabbed one week after argument with defendant in which defendant threatened victim), sentenced to a life sentence for the murder, a consecutive life sentence for the armed robbery, and ten years for burglary; *Brown v. State*, 264 Ga. 803 (450 SE2d 821) (1994), defendant convicted of malice murder, felony murder, attempted robbery, possession of a firearm during commission of crime, armed robbery, aggravated assault (defendant shot and killed taxicab driver during robbery), sentenced to life in prison for malice murder, life for each count of armed robbery, twenty years for each count of aggravated assault, ten years for armed robbery convictions, five years for each conviction for possession of a firearm during commission of crime; *Howard v. State*, 262 Ga. 784 (426 SE2d 365) (1993), defendant convicted of felony murder, burglary, and armed robbery (victim shot when he returned unexpectedly while defendant and two other men were burglarizing victim's house), sentenced to two consecutive life sentences for felony murder and armed robbery convictions; *Mitchell v. State*, 261 Ga. 347 (405 SE2d 38) (1991) (reversed on other grounds), defendant convicted of malice murder and sentenced to life in prison (victim shot in chest with shotgun because defendant upset over victim's relationship with defendant's former girl friend), received a fifteen-year sentence for burglary, as well as fifteen years for aggravated assault. The conduct of the defendants in these cases was at least as culpable as Thomason's, yet they were punished by imprisonment. Thomason's conduct should be punished with similar severity.

Although the majority opinion includes an appendix of cases offered to demonstrate that the penalty in this case was not dispro-

portionate to that imposed in others, the cited cases do not serve that purpose. While all murders are horrid, the fact that proportionality analyses are undertaken shows that some murders are to be considered more horrid than others, especially those in which the murder is planned, or there is cruelty and torture beyond the fact of killing, or there are multiple victims. Those horrors are not present in this case. The evidence in this case points unquestionably to the fact that Thomason was surprised in a burglary of the victim's home, and suggests strongly that he killed the victim with the victim's own gun, stolen in the burglary. It is thus apparent that Thomason did not go to the victim's home for the purpose of committing a murder and that he did not engage in brutality and violence beyond that necessary to carry out his criminal purpose. By contrast, the cases cited in the majority opinion's appendix reflect either a fixed purpose to commit murder or a greater degree of gratuitous violence: *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995), victim forced to kneel and shot execution style; *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992), victim shot in the chest before a demand for money was made and while he was opening the cash register, then shot again in the head after falling on the floor; *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987), victim whose relationship with defendant had gone sour (defendant told a friend before the shooting that he was going to "blow her brains out") shot three times, and her eleven-year-old niece shot in the head; *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986), victims both lying on the floor and shot in the back of the head, one victim at a distance of less than two feet; *Horton v. State*, 249 Ga. 871 (295 SE2d 281) (1982), victim killed and another shot at by defendant leaving scene of burglary; *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1976), victim shot in chest after demand for money by defendant who had passed victim, then returned to single victim out for robbery; *Bowden v. State*, 239 Ga. 821 (238 SE2d 905) (1977), one victim beaten so severely with a pellet gun as to make her unrecognizable and her brain visible from a large open wound behind her ear, then stabbed in chest with large butcher knife after death (elderly victim, also severely beaten with the same pellet gun, later died); *Stephens v. State*, 237 Ga. 259 (227 SE2d 261) (1976), victim robbed, hit in the face and kicked, caught when he tried to escape, and shot by a pistol placed in his ear; *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976), cab driver shot in the back of the head during planned robbery-murder; *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975), victim murdered and robbed by defendant after arson-murder plan with victim's nephew failed. In all of these cases, there is some factor such as premeditation, gratuitous brutality, or multiple victims which sets the conduct of those defendants apart from Thomason's.

The cases set out above, considered in context with Thomason's crime, persuade me that the imposition of the death penalty in this case is not proportionate to the penalty imposed in similar cases. The majority's affirmance of the sentence in this case lowers the standard to be applied to subsequent death penalty cases, and threatens to make routine the most serious penalty that can be imposed in this state. I must, therefore, dissent.

DECIDED JULY 16, 1997 —
RECONSIDERATION DENIED JULY 30, 1997.

*Bret J. Pangborn, Edwin Marger,* for appellant.
*Tambra P. Colston, District Attorney, Fred R. Simpson, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Assistant Attorney General,* for appellee.