## S98A1535. PRICE v. THE STATE.

(513 SE2d 483)

SEARS, Justice.

The appellant, Linda Joyce Price, was convicted of malice murder stemming from the stabbing of her 17-year-old nephew, Antowon Jackson, and of possession of a knife during the commission of a felony.[1] On appeal, Price contends that the trial court erred in denying a motion to suppress evidence that police obtained as a result of her arrest and their entry into her apartment, and that the trial court erred in refusing to give her requested charge on voluntary manslaughter. We conclude, however, that these contentions are without merit, and we therefore affirm.

Price and Jackson came to Atlanta in the summer of 1996 to find work associated with the Olympics, and they both found work at the International Horse Park in Conyers. They resided with Ms. Price's son in an apartment complex in College Park. On the morning of July 22, 1996, while driving himself and Price to work in Price's car, Jackson took the wrong highway exit, causing them to be late for work. Price became very angry, and witnesses for the State testified that they saw Price yelling and cursing at Jackson when they arrived at the venue. One worker testified that Price was complaining to her about Jackson causing her to be late when Jackson asked her not to talk about it at work. According to the witness, Price told Jackson to "shut [his] ass up," and Jackson walked away. This same witness tes-

---

[1] The crimes occurred on July 22, 1996, and Price was indicted on June 11, 1997. Price was found guilty on October 15, 1997, and was sentenced on October 21, 1997. The trial court imposed a life sentence for malice murder and a consecutive five-year sentence for the possession offense. Price filed a motion for new trial on November 12, 1997, and the court reporter certified the trial transcript on January 23, 1998. Price filed an amended motion for new trial on February 16, 1998, and the trial court denied the motion for new trial, as amended, on February 19. Price filed a notice of appeal to the Court of Appeals on February 26, 1998, and the appeal was transmitted to the Court of Appeals on June 4, 1998. The Court of Appeals transferred the appeal to this Court on June 15, 1998, and the appeal was docketed in this Court on June 18. The appeal was submitted for decision on briefs on August 10, 1998.

tified that Price was extremely mad, and stated that "I'm tired of this selfish mother fucker . . . he's lazy. He's ungrateful. He always talks on the phone. He doesn't take out the trash." The witness added that Price stated that "Antowon has fucked with the wrong person . . . he can't fuck with me. I'm through with him." According to the witness, Price added that she was not going to take Jackson home from work that day.

After leaving work without Jackson, Price went to the home of her sister, Edna Armour. From there, she called another sister, Mildred Buford, to tell her she was angry at Jackson and to expect Jackson to call her for a ride because Price had left him at work. There was also evidence that Price arrived home about 8:00 p.m., and that at approximately 8:10 p.m., Jackson attempted to call his mother in Birmingham, Alabama. When she did not answer, Jackson called his aunt, Veronica Parker, and told her, in an excited or scared tone of voice, to "find [his] mama." Parker stated that she could hear Price in the background and that her voice was loud. Parker added that the last thing Jackson said before the phone went dead was, "Auntie Linda get your hands out of my face." During this time, Price again called Buford, and told her to "come get [Jackson]" because "he has a knife at me." Buford then left her home to drive to Price's and Jackson's apartment.

Shortly after these calls, police and paramedics responded to a "person-shot" call at the apartment complex where Price and Jackson were living. They found Jackson lying on the ground near the doorway to a ground floor apartment. Medical personnel determined that Jackson was dead, but, because they feared for their safety, they did not determine the cause of death. It was later determined that Jackson died of a stab wound to his chest, and abrasions were found on the backs of his hands. Shortly after police had secured the crime scene around Jackson's body, Buford arrived at the apartment complex. She saw a covered body on the ground but could not get close to it because of the police barricade. Buford told Clayton County Police Lt. Larry Gibson that her sister and nephew lived in Apartment 1334, a third floor apartment, and that her was sister was then in the apartment. Buford informed Lt. Gibson that she had spoken with her sister before coming to the apartment, that her sister and Jackson had had some type of disagreement, and that she thought there was a good possibility that the victim was Jackson. The police, however, would not allow Buford to positively identify the body because of safety concerns. Buford gave Lt. Gibson the phone number to the apartment. Several police officers approached Price's apartment, and saw a knife lying on the walkway outside the third floor apartment. Lt. Gibson called Price, and told her that he needed to talk to her about an incident. At that point, she made a reference to her nephew,

and Lt. Gibson asked her to come outside with her hands over her head. Several officers testified that Price then stepped onto the front walkway from her apartment, and that an officer handcuffed her. Officer Stephen Maddox immediately entered the apartment and conducted a sweep to determine, according to his testimony, if there was any other victim or suspect inside. He found no one and went back out on the front walkway of the apartment. During the sweep, Maddox saw a knife on the kitchen floor, but did not seize it. After Maddox exited the apartment, one of the officers read Price her *Miranda* rights. Price then requested that she be questioned inside the apartment because she was embarrassed standing outside. While being questioned inside the apartment, Price informed Lt. Gibson that she had been cut, and an officer seized the knife on the kitchen floor.

The knife, as well as the counter and floor of the kitchen, had blood stains on it. The shirt Price was wearing also had blood on it, and Price had a small superficial cut on one of her fingers. A serologist testified that the blood found on Price's shirt and on the knife found on the kitchen floor was consistent with that of Jackson.

1. Having reviewed the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found Price guilty of malice murder and of possession of a knife during the commission of a crime beyond a reasonable doubt.[2]

2. In her first enumeration of error, Price contends that the trial court erred in denying her motion to suppress evidence of the knife found on the kitchen floor and of the blood found on her shirt. For the reasons that follow, we disagree.

We agree with Price's contention that she was placed under arrest when she was handcuffed and read her *Miranda* rights when she came out the front door of her apartment. Her warrantless arrest, however, was

> constitutionally valid if, at the moment the arrest [wa]s made, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the accused had committed or was committing an offense.[3]

Moreover, "[t]he test of probable cause ' "requires merely a prob-

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).
[3] *Callaway v. State*, 257 Ga. 12, 13-14 (2) (354 SE2d 118) (1987). Accord *Thomason v. State*, 268 Ga. 298, 303 (2) (c) (486 SE2d 861) (1997); *Bishop v. State*, 268 Ga. 286, 288 (2) (486 SE2d 887) (1997).

ability — less than a certainty but more than a mere suspicion or possibility. (Cits.)" [Cit.]' *Williams v. State*, 167 Ga. App. 42, 43 (306 SE2d 46) (1983)."[4] And, in reviewing a trial judge's probable cause decision, an appellate court will "construe the evidence most favorably to uphold the ruling of the trial court and in the absence of evidence demanding a finding contrary to the judge's determination, we will not disturb the ruling."[5]

In the present case, when the officers arrested Price, they knew that Price and her nephew had just been together; that Price was angry at her nephew; that Price's telephone call to her sister had alarmed her sister enough that she immediately drove to the apartment; that the body they had discovered was located close to Price's apartment and was probably her nephew; that there was a knife located just outside her apartment door; and that when Lt. Gibson called her and told her that he needed to speak with her about an incident, she made a reference to her nephew. We conclude that this information provided probable cause to take Price into custody.[6] Because Price's shirt was subsequently seized from her at the jail as a result of her arrest, and because we have concluded that the arrest was lawful, the trial court did not err in denying Price's motion to suppress evidence of the blood found on her shirt.

The question of the propriety of the seizure of the knife found on the kitchen floor remains. We conclude, however, that because the police knew that a third person, Price's brother, lived at the apartment, and because the police did not know whether he was in the apartment, whether he was involved in the murder, and whether the murder weapon was a knife or a gun, the protective sweep of the apartment conducted by Officer Maddox was constitutional.[7] Furthermore, as the evidence authorized the trial court to find that Price invited the officers into her apartment once she was handcuffed and that the officers then saw the knife in plain view, the seizure of the knife was permissible.[8]

Finally, even if we assume that the protective sweep conducted by Officer Maddox was unreasonable, we would nevertheless conclude that the officers' entry into the apartment with Price's consent constituted an independent source for discovering the evidence. In *Murray v. United States*,[9] several law enforcement agents conducted an illegal search and observed but did not seize evidence that was in

---

[4] *Brown v. State*, 269 Ga. 830, 831-832 (504 SE2d 443) (1998).

[5] Id. at 833.

[6] See *Thomason*, 268 Ga. at 303; *Bishop*, 268 Ga. at 288.

[7] *Delay v. State*, 258 Ga. 229, 230 (2) (b) (367 SE2d 806) (1988); *Hatten v. State*, 253 Ga. 24, 25 (315 SE2d 893) (1984).

[8] *Perkins v. State*, 269 Ga. 791, 794-795 (3) (505 SE2d 16) (1998).

[9] 487 U. S. 533 (108 SC 2529, 101 LE2d 472) (1988).

plain view. About eight hours after the initial illegal entry, the agents obtained a warrant to search the warehouse where the evidence was located, and in obtaining the warrant, the agents "did not mention the prior entry and did not rely on any observations made during that prior entry."[10] Pursuant to the warrant, the agents seized the evidence they had observed earlier. The Supreme Court ruled that the evidence discovered pursuant to the search warrant would not have to be suppressed if the government could establish that the warrant was in fact a genuinely independent source for the discovery of the evidence.[11] The Court then remanded the case to the district court for it to make the initial determination whether the warrant constituted an independent source.[12]

In the present case, we conclude that Price's consent was an independent source for the discovery of the knife found on the kitchen floor. In this regard, we have concluded that Price's arrest was constitutional, and it is undisputed that Officer Maddox did not mention to Price what he saw during his sweep of the apartment, and that no officer asked Price to permit the police to ask her questions inside the apartment. To the contrary, the record shows that she requested that the interview be conducted in the apartment. Under these circumstances, we conclude that the consent is an independent source for the discovery of the knife.

For these reasons, we conclude that the trial court did not err in denying Price's motion to suppress.

3. In her second enumeration of error, Price contends that the trial court erred in refusing to give her requested charge on voluntary manslaughter. We disagree.

First, Price contends that the evidence shows that she was angry at Jackson in the morning and that her anger "re-ignited" when he returned home that night. Price is thus contending that the "serious provocation" that was required to cause her passion was in part due to their dispute in the morning, stemming from Jackson causing Price to be late for work and from Jackson's general laziness. We conclude, however, that these "provocations" are not the type of provocations sufficient to excite a passion to kill in a reasonable person.[13] Moreover, these alleged provocations occurred early in the morning on the day of the killing, and the length of the cooling off period can be considered by a trial court in determining " 'whether there is slight evidence that the defendant acted as the result of sudden, vio-

---

[10] Id. at 535-536.
[11] Id. at 539-543.
[12] Id. at 542-544.
[13] See OCGA § 16-5-2 (a); *Isaac v. State*, 263 Ga. 872, 874-875 (5) (440 SE2d 175) (1994).

624

lent and irresistible passion resulting from serious provocation.' "[14] In this case, the trial court could have concluded as a matter of law that being lazy and causing Price to be late for work did not constitute even slight evidence of provocation because of the lengthy cooling off period between these "provocations" and the killing.[15]

Moreover, although Buford, Price's sister, testified that Price told her that Jackson had pointed a knife at her and had cut her, Price's sister did not testify that Price was passionate as a result of this "provocation," but that Price merely told her to come get Jackson. Finally, although Jackson's aunt's testimony indicates that Jackson and Price were having a disagreement when she spoke to Jackson by telephone, it sheds no light on whether Price was acting from "a sudden, violent, and irresistible passion."[16]

For these reasons, we conclude the trial court did not err in refusing to give Price's requested charge on voluntary manslaughter.

*Judgment affirmed. All the Justices concur, except Benham, C. J., and Hines, J., who dissent.*

BENHAM, Chief Justice, dissenting.

I respectfully disagree with the majority's determination that the there was no evidence to support appellant's request to charge on voluntary manslaughter. Accordingly, I dissent to the affirmance of appellant's malice murder conviction.

Voluntary manslaughter occurs when one kills another human being under circumstances which would otherwise be murder, if the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . ." OCGA § 16-5-2 (a). In a murder trial, if there is any evidence, however slight, as to whether the offense is murder or voluntary manslaughter, the jury should be instructed on the law of both offenses. *Henson v. State*, 258 Ga. 600 (5) (372 SE2d 806) (1988).[17] It is a question of law whether there is slight evidence that the defendant acted as the result of sudden, violent and irresistible passion resulting from serious provocation. *Gooch v. State*, 259 Ga. 301 (3) (379 SE2d 522) (1989). However, it is

---

[14] *Aldridge v. State*, 258 Ga. 75, 76 (2) (365 SE2d 111) (1988) (quoting *Henderson v. State*, 234 Ga. 827 (218 SE2d 612) (1975)).

[15] Id.

[16] OCGA § 16-5-2 (a).

[17] In *Gooch v. State*, 259 Ga. 301, n. 2 (379 SE2d 522) (1989), this Court pointed out to trial courts that the better practice would be to charge voluntary manslaughter in all cases in which it was requested by the defendant since giving such a charge on request cannot be reversible error and would vastly reduce the appellate expense and delay of litigating and deciding the sometimes difficult question which we are now facing — whether there is sufficient evidence to support such a charge.

for the fact-finder to determine the sufficiency of the provocation and the questions of reasonable fears and "cooling time." *Hagans v. State*, 187 Ga. App. 216 (3) (369 SE2d 536) (1988).

" 'While words and threats alone are generally not sufficient provocation, the issue of whether a reasonable person acts as the result of an irresistible passion may be raised by words which are connected to provocative conduct by the victim.' " *Veal v. State*, 250 Ga. 384 (1) (297 SE2d 485) (1982). The evidence in the case at bar reflects that, shortly before emergency personnel found the victim fatally stabbed, appellant called her sister and told her that the victim had threatened her with a knife and had cut her. The day-long argument between appellant and the victim, the threatening gestures made by the victim toward appellant, and the victim's infliction of injury upon appellant within minutes of the fatal stabbing constitute evidence of words and provocative conduct which raise the question whether a reasonable person acted as the result of an irresistible passion. *Washington v. State*, 249 Ga. 728 (3) (292 SE2d 836) (1982). Slight evidence being present, it was error for the trial court to refuse to permit the fact-finder to determine whether the provocation was sufficient and whether appellant's response was the sudden, violent passion that would be aroused in a reasonable person.

Restricting itself only to evidence that appellant and the victim had quarreled the morning the victim was killed, the majority opines that the trial court could have concluded, as a matter of law, that the "cooling off" period between the morning provocation and the evening killing reduced the evidence of provocation to something below the "slight evidence" which authorizes the giving of a requested charge. As indicated above, there was more evidence of provocation than the argument the parties had had earlier that morning. Furthermore, *Aldridge v. State*, 258 Ga. 75 (2) (365 SE2d 111) (1988), cited by the majority in support of its theory, involved provocation that occurred 3½ days before the victim was killed. While I would agree that a cooling period of half a week is, as a matter of law, too long to sustain the conditions for voluntary manslaughter, that is not the situation here where there is evidence of provocation minutes before the fatal blow was struck. The majority recognizes that there was evidence that the victim had threatened and cut appellant with a knife, but concludes that there was no evidence that this provocation caused appellant to be "passionate." It is for the properly-instructed jury, not the appellate court, to determine if the provocation was sufficient and whether appellant's response was the sudden, violent, irresistible passion that would be aroused in the reasonable person.

Because I believe the slight evidence necessary to support the request to charge voluntary manslaughter was present in this case

and the fact-finder was wrongfully denied the opportunity to consider whether appellant's actions constituted voluntary manslaughter, I respectfully dissent.

I am authorized to state that Justice Hines joins in this dissent.

DECIDED MARCH 8, 1999.

*Patricia F. Angeli,* for appellant.

*Robert E. Keller, District Attorney, Erman J. Tanjuatco, Thurbert E. Baker, Attorney General, Frank A. Ilardi, Assistant Attorney General,* for appellee.