## S90A1559. SUMPTER v. THE STATE.
(398 SE2d 12)

WELTNER, Justice.

James Sumpter shot and killed his wife, Lois Sumpter, with a handgun. He was convicted by a jury of felony murder and of pointing a pistol at another, and was sentenced to life imprisonment and for a misdemeanor.[1]

After a history of death threats and physical and verbal abuse of his wife, Sumpter pointed a pistol at her and at a friend of her daughter; fatally shot Lois Sumpter in the back; and fired more shots into the ground near her prostrate body. Although Lois Sumpter had a handgun in her purse, she did not put her hand into it, nor did she mention the handgun or threaten or berate Sumpter.

1. (a) Sumpter contends that the trial court erred in charging the jury that if it found him guilty of aggravated assault, it could find him guilty of felony murder regardless of its finding as to malice murder.

(b) The charge was correct under the present law. See *Foster v. State*, 259 Ga. 206 (4) (378 SE2d 681) (1989) and cits. In *Lewis v. State*, 260 Ga. 404, fn. 2 (396 SE2d 212) (1990), this court recognized some problems with the existing law, but noted that the remedy should lie with the General Assembly.

2. (a) Sumpter argues that the trial court erred in admitting evidence of his in-custody statements, alleging that they were involuntary in that he was not advised of his "*Miranda* rights" prior to giving the statements; he was "sort of sick" and "under the weather" from having been drinking all day; and that he was coerced by a detective threatening him with the nonexistent crime of "first-degree murder."

(b) Unless clearly erroneous, a trial court's factual determinations relating to the credibility of witnesses and the admissibility of confessions will be upheld on appeal. [Cits.] [*Dampier v. State*, 245 Ga. 427, 430 (3) (265 SE2d 565) (1980).]

Sumpter admitted that he was informed of the *Miranda* warnings prior to making his statement, and that he signed the waiver form before signing his statement. Sumpter was literate. He did not tell the detective that he wished to remain silent, or that he wanted an attorney, or that he wanted the interrogation to end. Sumpter's emotional state and partial intoxication did not vitiate per se the voluntariness of his statement. See *Carter v. State*, 257 Ga. 510 (3) (361 SE2d 175)

---

[1] The crimes occurred on September 28, 1989. Sumpter was found guilty on February 12, 1990, and was sentenced the same date. His motion for new trial was filed on March 7, 1990, and denied on June 27, 1990. The appeal was docketed on August 23, 1990, and submitted without oral argument on October 5, 1990.

(1987); *Fowler v. State*, 246 Ga. 256 (3) (271 SE2d 168) (1980). The officer taking the statement testified that Sumpter did not appear to be under the influence of drugs or alcohol. The trial court's finding of voluntariness was not clearly erroneous.

3. (a) Sumpter urges that the trial court erred in admitting a tape recording of an argument between himself and his wife, which took place after he had been jailed for a prior battery of the victim. The recording disclosed that he had threatened to kill his wife if she had him arrested again. He contends that the trial court failed to instruct the jury, at the time the recording was admitted, that it might be considered only to illustrate prior difficulties.

(b) In *Cannon v. State*, 257 Ga. 475, 478 (3) (360 SE2d 592) (1987), we held:

> Although as a general rule the state may not introduce evidence of a criminal defendant's bad character unless the defendant first introduces evidence of his good character, "[w]e have often held that evidence of prior difficulties between an accused and the victim is admissible to illustrate the accused's motive, intent, or bent of mind toward the victim. [Cits.]" *Hales v. State*, 250 Ga. 112, 113 (2) (296 SE2d 577) (1982).

The evidence did not place Sumpter's character in evidence impermissibly, nor was it inadmissible because of its possible adverse effect upon him. Similarly, the evidence was probative as to Sumpter's "motive, intent, or bent of mind toward the victim," *Cannon*, supra, and the trial court so instructed the jury in its charge. There was no error.

4. The evidence is sufficient to permit a rational trier of fact to find Sumpter guilty of felony murder and pointing a pistol at another beyond reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

· *Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 21, 1990 —
RECONSIDERATION DENIED DECEMBER 19, 1990.

*John H. Tarpley, Sr.,* for appellant.

*Robert E. Wilson, District Attorney, Barbara B. Conroy, Thomas S. Clegg, Assistant District Attorneys, Michael J. Bowers, Attorney General, C. A. Benjamin Woolf,* for appellee.

## S90G0484. CENTRAL OF GEORGIA RAILROAD COMPANY v. SWINDLE.

### (398 SE2d 365)

FLETCHER, Justice.

This case, *Central of Ga. R. Co. v. Swindle*, 194 Ga. App. 24 (389 SE2d 779) (1989), is here on certiorari. The jury awarded plaintiff-appellee $875,000 in his action against his employer railroad under the Federal Employers' Liability Act (FELA). 45 USCA § 51 et seq. The question on certiorari is whether the verdict is either excessive or punitive.

Plaintiff is employed by defendant-appellant as a computer operator. On February 24, 1985, he slipped and fell in a bathroom on company premises, injuring his right shoulder. Initially, he did not think that the injury was serious enough to warrant filling out an accident report. A company physician subsequently diagnosed plaintiff as having muscle spasms in the right lumbar and lower thoracic regions, as well as tenderness over the joint of the right shoulder.

Plaintiff began treatment at an orthopedic clinic on April 25, 1985. He initially complained of pain in his right shoulder. He later complained of limited movement in his shoulder, as well as pain in his neck. He was initially diagnosed as suffering from an "impingement syndrome," which is an irritation and scarring of the coracoacrominal ligament and the rotator cuff. Later diagnoses included bursitis; "cervical spondylosis," which is loss in the height of the vertebra caused by trauma to the spine; possibly a "discogenic syndrome," which is pain emanating from the intervertebral disk; and a ruptured or slipped disk. Anti-inflammatory medications and physical therapy were prescribed.

To relieve plaintiff's complaints of shoulder pain, in 1985 three surgical procedures were performed: one outpatient procedure, one arthroscopic procedure requiring overnight hospitalization, and one procedure requiring two nights of hospitalization. Surgery was performed in August of 1986 for the disk problem which had caused, among other things, neck pain. Arthroscopic surgery requiring overnight hospitalization was again performed in March of 1988 for shoulder complaints.

At one point in plaintiff's treatment, his physician became concerned that plaintiff was suffering from a psychological disorder known as "chronic pain syndrome." The concern was based upon the absence of any objective basis for his pain and plaintiff was prescribed anti-depressants.

All physicians treating plaintiff testified that, although he will continue to be bothered by some neck and shoulder pain, his pain will diminish as he learns to avoid repetitive over-the-head movement of his arm in the course of doing such things as lifting objects. The phy-

sician performing the last surgery did not envision the need for any further surgery.

Plaintiff's hobbies include hunting, fishing, homebuilding, and playing baseball and football with his sons. He has had to restrict these activities. Plaintiff's wife testified that this has caused plaintiff to become grouchy and depressed. When asked whether plaintiff would have difficulty fishing, one of the physicians responded, "Overhead casting, yes."

Plaintiff's total special damages consisted of $32,218.82 in medical expenses and $27,090 in lost income.

We reverse the judgment of the Court of Appeals. After consideration of the record in this case, we are led to the conclusion that the jury intended at least a portion of the verdict to have the effect of punishing the defendant and influencing its conduct rather than compensating the plaintiff for his injuries. In FELA cases, this is impermissible.

Damages recoverable in an FELA action are compensatory only. *Seaboard System Railroad v. Taylor*, 176 Ga. App. 847 (2) (338 SE2d 23) (1985). The FELA plaintiff can recover special damages for past and future lost wages and medical expenses, as well as general damages for pain and suffering. See, e.g., *CSX Transp. v. Darling*, 189 Ga. App. 719 (377 SE2d 217) (1988); *Nairn v. Nat. R. Passenger Corp.*, 837 F2d 565 (2nd Cir. 1988). In arriving at its verdict, the jury should take into consideration the plaintiff's occupational disability and its impairment on his earning power. *Dugas v. Kansas City S. R. Lines*, 473 F2d 821, 827 (5th Cir. 1973). However, punitive damages are not allowable. *Seaboard System Railroad v. Taylor*, supra.

Federal courts have held that in determining whether a trial court abuses its discretion in refusing to order a new trial on the issue of damages in an FELA case, "the appellate court must make its own 'detailed appraisal of the evidence bearing on damages.' *Grunenthal v. Long Island Rail Road Co.*, 393 U. S. 156, 159 (89 SC 331, 333, 21 LE2d 309) (1968)." *Nairn v. Nat. R. Passenger Corp.*, supra, 837 F2d at 567.

The jury's determination of the amount of damages to be awarded in an FELA case has been held to be "otherwise inviolate, 'absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or *another improper cause invaded the trial.*'" (Emphasis supplied.) *Seaboard System Railroad v. Taylor*, 176 Ga. App. at 849, supra, citing *Lane v. Gorman*, 347 F2d 332, 335 (10th Cir. 1965).

Consistent with these holdings, we find the jury verdict in this case to be a verdict that can only be logically explained as having resulted from a punitive cause, which is an improper cause in FELA cases.

The evidence in this case shows that, although the plaintiff has undoubtedly sustained painful physical injuries which have required him to undergo extensive medical treatment, no occupational disability has resulted. He continues working in an office in the employ of the defendant railroad, and there is no evidence that his pay scale is less than it was before the accident. We find no evidence of any projected dollar amount of future medical expenses or future lost wages.

"[A] detailed appraisal of the evidence bearing on damages," *Grunenthal*, 393 U. S. at 159, supra, leads us to believe that the verdict here "raise[s] an irresistible inference that . . . [an] improper cause invaded the trial." *Seaboard System Railroad v. Taylor*, 176 Ga. App. at 849, supra. The defendant filed a motion in limine requesting that the plaintiff be barred from making "[a]ny suggestion that damages should be awarded in this case for the purpose of punishing the defendant or for the purpose of setting an example in order to influence conduct in the future." Recognizing that references to such matters are irrelevant in an FELA case and are also highly prejudicial, the trial court granted the motion.

Notwithstanding the ruling of the trial court on the motion in limine, a review of the transcript shows a pervasive and persistent attempt on the part of the plaintiff to establish improper motive and anti-union sentiment on the part of the defendant railroad, "suggesting that damages be awarded . . . for the purpose of punishing the defendant." Based upon our "detailed appraisal of the evidence bearing on damages," we can only conclude that this "improper cause" permeated the trial and resulted in the jury's rendering a verdict based, at least in part, on punitive damages.[1]

---

[1] Our conclusion in this regard is supported by the pejorative nature of plaintiff's closing argument, excerpted as follows:

"Why go into the fact that [railroad personnel] call up doctors? Well, I'll have to be honest with you now, folks, there's two reasons. Maybe you think one of them is illegitimate. . . . The very idea of presuming the right to call up this man's, or any other employee's doctor and discuss with him, without telling Bill, without permission, without a release, without nothing, discussing his medical condition, bothers me. It really does. It shows an attitude I think maybe is troublesome. And what did they call the doctors about? Did they really call them because they're interested in Bill's condition? What did Tom Barton ask about? When can he come back to work and what's the disability rating going to be. What's he worried about? He wants to talk to the doctor about the claim. Ladies and gentlemen, I suggest to you that what we need from the railroad is less suspicion and more safety."

"Face-to-face, they never questioned Bill; behind his back they mounted this investigation. Analogy to a child: behind-the-back investigations; calling his doctors. Haven't we come further than that in this society in this day and time? Haven't we come further than that now? Is that any way to treat an employee?"

"Maybe it's all right to do an investigation of somebody like this without ever telling him face-to-face you think he's lying, and then to hide the file. Maybe it's all right to keep a file on his union activities under his name. Why keep a record of how many of these claims he wins for his fellow employees under his name? I don't understand that."

"You're going to say something about how to treat employees."

---

"Why don't they have somebody sitting over there who's going to pay attention to what you say in this case with your verdict."

"Compare him to the railroad. I'll submit to you that the railroad does have a peculiar mentality. How do they repay Bill Swindle's hard work and loyalty? . . . Has the railroad been fair to Bill Swindle? Has the railroad been fair to you? . . . [W]e ask that when you're deciding what to do, that you're not so fair to the railroad that you encourage their peculiar mentality. We ask that you not be so fair that you encourage their misplaced priorities. We ask that you not be so fair to the railroad that you encourage this kind of treatment of the employees."

"[W]hy would they go to such extremes with these efforts to prove it happened off the premises; why would they do that? Why did they keep a union file in his name? . . . I asked Mr. Gardner, 'What happens if you had proved it happened off the property?' Because that would mean Bill Swindle had filed a false accident report. You remember I asked Bill what happened to employees that filed false accident reports? They get fired. I suspect that explains a lot of what has gone on with Bill Swindle's injury. He's chairman of the [T]CU, he's got a file that keeps track of how many times he represents his fellow employees and makes the railroad pay them money. What kind of future does this man have at this railroad?"