S09P1028. ARRINGTON v. THE STATE.
(687 SE2d 438)

HINES, Justice.

A jury convicted Robert Owen Arrington of malice murder and felony murder and recommended a death sentence. The trial court denied Arrington's motion for new trial, and he appeals.[1] For the reasons set forth below, this Court affirms.

*General Grounds*

1. The evidence adduced at trial showed that on April 3, 2001, deputies from the Richmond County Sheriff's Department responded to a domestic dispute involving Arrington and the victim, Kathy Hutchens, at the victim's duplex apartment. As a result, Arrington, who had been living with Hutchens for two months, went

---

[1] The murder occurred on or about April 4, 2001. Arrington was indicted for malice murder and felony murder by a Richmond County grand jury on July 10, 2001. The State filed written notice of its intent to seek the death penalty on December 19, 2001. Jury selection began on April 27, 2004, and the jury convicted Arrington on both counts of the indictment on May 6, 2004, and recommended a death sentence on May 7, 2004. The trial court imposed a death sentence for the murder, and the felony murder conviction was vacated by operation of law. *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Arrington filed a motion for new trial on June 7, 2004, which he amended on November 4 and 7, 2005, and supplemented on November 28, 2005, and which the trial court denied on November 7, 2008. Arrington filed a notice of appeal on November 25, 2008. The appeal was docketed in this Court on March 11, 2009, and was orally argued on September 8, 2009.

to a neighbor's home to stay. Ten days later officers were again called to Hutchens's apartment after her sister discovered her severely decomposed body inside. Hutchens had sustained numerous blunt force head injuries, and the stage of decomposition of her body was consistent with her death's occurring approximately ten days prior to the autopsy, which was performed on April 14, 2001. Hutchens had cashed a check for over $600 on April 3, 2001, and Arrington's neighbor testified that on that same day an intoxicated Arrington told him that he had won $500 in the lottery. A bloody fingerprint found at the crime scene matched Arrington's fingerprint; bloody boot impressions found at the scene were connected to Arrington's boots; and blood on Arrington's boots matched Hutchens's blood.

James Griffin testified that, while incarcerated with Arrington, Arrington told him that he had entered the victim's apartment when she left to cash her disability check and that he had hidden in a hallway until Hutchens returned and showered. According to Griffin, Arrington said that he confronted Hutchens after she came out of the shower, they argued, and he began attacking her in the bathroom. The crime scene investigator testified that, based on blood spatter pattern analysis, Hutchens's beating began in the bathroom. We find the evidence sufficient to authorize a rational trier of fact to find Arrington guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See OCGA § 16-5-1.

### Constitutional Issues

2. Qualifying prospective jurors on the basis of their views regarding the death penalty "does not deny capital defendants their right to an impartial jury drawn from a representative cross-section of the community and is not otherwise unconstitutional. [Cits.]" *Walker v. State*, 281 Ga. 157, 162 (8) (635 SE2d 740) (2006). See *Wainwright v. Witt*, 469 U. S. 412, 418-426 (II) (105 SC 844, 83 LE2d 841) (1985).

3. Arrington's contention that the trial court erred in denying his motion to quash the indictment because it did not include the statutory aggravating circumstances has previously been decided adversely to him. See *Jones v. State*, 282 Ga. 784, 791 (2) (653 SE2d 456) (2007) (holding under Georgia law and reaffirming under federal constitutional law that statutory aggravating circumstances need not be included in indictments).

4. Arrington contends that Georgia's statutory death penalty scheme unconstitutionally promotes the arbitrary and capricious imposition of the death penalty. Georgia's death penalty statutes

have been repeatedly upheld as constitutional. See *Nance v. State*, 280 Ga. 125, 126 (2) (623 SE2d 470) (2005); *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976). See also *Zant v. Stephens*, 462 U. S. 862, 876-879 (I) (103 SC 2733, 77 LE2d 235) (1983) (stating that Georgia's statutory aggravating circumstances constitutionally narrow the class of death-eligible defendants). The prosecutorial discretion given to district attorneys has also been upheld as constitutional based on the fact that "[a] prosecutor's decision to seek the death penalty is limited by the jury's ultimate decision to impose it. [Cit.]" *Jenkins v. State*, 269 Ga. 282, 285 (2) (498 SE2d 502) (1998). See also *McCleskey v. Kemp*, 481 U. S. 279, 311-312 (107 SC 1756, 95 LE2d 262) (1987). "[T]he U. S. Constitution and Georgia law authorize the death penalty for [Arrington's] crimes and [Arrington] has failed to show that the prosecutor acted in an unconstitutional manner with respect to his case. [Cit.]" *Jenkins*, 269 Ga. at 285 (2). See *Rower v. State*, 264 Ga. 323, 324 (2) (443 SE2d 839) (1994).

Arrington also contends that this Court's proportionality review does not meet statutory and constitutional requirements. This Court has rejected similar arguments. See, e.g., *McMichen v. State*, 265 Ga. 598, 611 (25) (458 SE2d 833) (1995) (citing *McCleskey*, 481 U. S. at 306-308). See also *Gissendaner v. State*, 272 Ga. 704, 717 (19) (a) (532 SE2d 677) (2000) (stating that this Court's proportionality review concerns whether the death penalty "is excessive per se" or is "substantially out of line" for the type of crime involved and not whether there *ever* have been sentences less than death imposed for similar crimes). Arrington has presented nothing that supports a contrary conclusion in this case. See *Terrell v. State*, 276 Ga. 34, 44 (9) (572 SE2d 595) (2002).

## Pre-Trial Issues

5. We find no abuse of the trial court's discretion in its denial of Arrington's request for an ex parte hearing on his motion for funds to retain a jury composition expert. The use of a jury composition expert "cannot be considered a secretive trial strategy." *Thomason v. State*, 268 Ga. 298, 309 (6) (486 SE2d 861) (1997). Thus, Arrington was not improperly placed "in a position where, in order to make the showing required for public funds with which to employ an expert, he had to reveal his theory of the case to the State." Id. at 310 (6).

6. Arrington contends that the trial court erred in denying his request for funds with which to retain a mitigation specialist and a prison consultant. "Absent discretionary abuse, a trial court's ruling on a criminal defendant's motion for the appointment of an expert witness will be upheld. [Cits.]" *Thomason*, 268 Ga. at 310 (7).

After an ex parte hearing on Arrington's initial request for a mitigation specialist made two weeks before his case was initially set for trial, the trial court found, among other things, that defense counsel had done considerable trial preparation, including obtaining evidence that could be used in mitigation. The trial court then granted Arrington's motion to continue the case and granted Arrington funds to assist in the preparation of any additional mitigation evidence that he wished to present. Moreover, no limit was placed on the hours for which counsel would be paid for investigating and preparing the case. We find no abuse of discretion here, as our review of the record shows that Arrington did not establish that the services of a mitigation specialist or a prison consultant were critical to his defense or that without such assistance his trial would be rendered unfair. See *Roseboro v. State*, 258 Ga. 39, 41 (3) (d) and n. 3 (365 SE2d 115) (1988).

### Jury Selection Issues

7. Arrington contends that the trial court erred in limiting voir dire by excluding several questions from the defense's proposed juror questionnaire and by refusing in some instances to allow the defense to ask jurors certain questions to determine whether they had formed pre-judgments regarding the death penalty. The scope of voir dire is generally a matter for the trial court's discretion. *Barnes v. State*, 269 Ga. 345, 351 (10) (496 SE2d 674) (1998). See also *Jones v. State*, 263 Ga. 904, 907 (9) (b) (440 SE2d 161) (1994) (holding that whether to send a juror questionnaire out with the summons lies within the trial court's discretion). A comprehensive questionnaire was sent to prospective jurors, and each juror was thoroughly questioned during individual voir dire. Accordingly, this Court finds no error. See *Curry v. State*, 255 Ga. 215, 218 (2) (b) (336 SE2d 762) (1985).

8. Arrington complains that the trial court erroneously excused two prospective jurors for cause. The trial court excused prospective jurors Ristroph and Barkley due to their inability to vote for the death penalty as a possible sentence.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " A juror's bias for or against the death penalty does not need to be proved with unmistakable clarity; the relevant inquiry on appeal is whether the trial court's finding that a prospec-

tive juror is disqualified is supported by the record as a whole.

(Citations omitted.) *Presnell v. State*, 274 Ga. 246, 248-249 (3) (a) (551 SE2d 723) (2001).

Prospective juror Ristroph initially stated that he could not vote for a death sentence except possibly in the case of a serial killer. He explained that voting to impose the death penalty would be morally inconsistent with his belief that all life has inherent value and that he did not believe that he would be able to put his personal beliefs aside and follow the judge's instructions in considering all three sentencing options. Although Ristroph eventually stated that he might be able to "consider" a death sentence under the appropriate circumstances, the trial court was authorized to find from the totality of his responses that he "held a strong personal aversion to the death penalty and was uncertain as to whether [ ]he could actually vote to impose that sentence." *Greene v. State*, 268 Ga. 47, 52 (485 SE2d 741) (1997). The trial court did not abuse its discretion by excusing him. Id. at 50.

After prospective juror Barkley stated during his initial voir dire that he could vote to impose a death sentence, although it would be difficult for him to do so, the trial court qualified him to serve. However, Barkley reported to the trial court the following day that, after reflection and prayer, he did not believe that he would be capable of voting for a death sentence under any circumstances. While Barkley stated that he was not conscientiously opposed to the death penalty and that he could imagine some circumstances where it would be an appropriate sentence, he also stated that he did not know whether he could vote for the death penalty, even in circumstances where he felt it was appropriate based upon the judge's instructions. Considering the totality of Barkley's responses, the trial court was authorized to find him disqualified. See *Greene*, 268 Ga. at 50-51; *Crowe v. State*, 265 Ga. 582, 589 (10) (458 SE2d 799) (1995).

9. After the State used 70 percent of its peremptory strikes to remove African-American persons from the jury, Arrington objected under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). While the trial court did not make a finding that Arrington had established a prima facie case of discrimination, the trial court did require the State to articulate its reasons for the peremptory strikes, rendering moot the issue of whether Arrington had established a prima facie case. *Lewis v. State*, 262 Ga. 679, 680 (2) (424 SE2d 626) (1993) (quoting *Hernandez v. New York*, 500 U. S. 352, 358 (II) (A) (111 SC 1859, 114 LE2d 395) (1991)). Thus, we consider whether the State tendered racially neutral reasons for the exercise

of its peremptory strikes.

The prosecutor stated that five of the seven African-American prospective jurors struck by the State were struck because they were evasive or hesitant about whether they could vote to impose the death penalty, but the prosecutor acknowledged that he relied on the body language and the facial expressions of one of those prospective jurors in determining that she would lean toward a life sentence and away from the death penalty. The prosecutor explained that he struck one of the African-American prospective jurors because he stated that he had been the victim of a false arrest. As to the final African-American prospective juror struck by the State, a female, the prosecutor stated that she was struck in order to reach male jurors and, thus, to obtain a more balanced jury when it became apparent that the defense was striking male jurors in order to seat a predominantly female jury.[2] Arrington contended that the prosecutor's explanation based on the prospective juror's body language and facial expressions was pretextual, but he offered no evidence to support his assertion. He also did not assert that any of the prosecutor's other tendered reasons for striking the African-American prospective jurors were improper. The trial court accepted the State's basis for the strikes.

The State's tendered reasons were "based on something other than the race of the juror" and, thus, were facially race-neutral. *Hernandez*, 500 U. S. at 360 (II) (B). See also *Barnes*, 269 Ga. at 349-351 (6); *Davis v. State*, 263 Ga. 5, 8 (10) (426 SE2d 844) (1993). Regarding the prosecutor's explanation based on the prospective juror's facial expressions and body language, a strike based upon a juror's demeanor can be race-neutral. See *Snyder v. Louisiana*, 552 U. S. 472, 477 (II) (128 SC 1203, 170 LE2d 175) (2008) (stating that race-neutral reasons for peremptory strikes often invoke a juror's demeanor). Moreover, Arrington has not pointed to anything in the record that would show that the proffered reasons did not apply, and the record contains support for the State's explanations for the striking of the remaining six prospective jurors. Considering the totality of the circumstances, we cannot conclude that the trial court's *Batson* ruling was clearly erroneous.

---

[2] Arrington did not raise a gender discrimination claim in the trial court, nor has he complained about gender discrimination on appeal. See *Sears v. State*, 268 Ga. 759, 764 (9) (493 SE2d 180) (1997) (declining to consider whether the State exercised its peremptory strikes with an intent to discriminate on the basis of gender where the defendant did not raise this objection at trial). See also *McKenzie v. State*, 223 Ga. App. 108, 113 (3) (a) (476 SE2d 868) (1996).

*Guilt/Innocence Phase Issues*

10. On cross-examination of the victim's sister, the defense sought to elicit testimony that the victim told her that the victim's neighbor, Farrell McMahan, had raped the victim several months prior to the murder. The victim's sister made this statement in her taped interview to police on the day the victim's body was discovered. Arrington contends that the trial court erred in refusing to admit this testimony under the necessity exception to the hearsay rule, see OCGA § 24-3-1 (b), because it would have raised the possibility that McMahan, rather than Arrington, committed the murder and because it would have impeached McMahan, who testified for the State, by showing that he had a motive to testify falsely.

There are two requirements under the necessity exception, "necessity" and "particularized guarantees of trustworthiness." *Azizi v. State*, 270 Ga. 709, 711 (2) (512 SE2d 622) (1999). The necessity requirement "is satisfied upon a showing that the declarant is deceased or unavailable, that the statement is relevant to a material fact, and that the statement is more probative than any other evidence which may be offered. [Cit.]" Id. The declarant here, the victim, is deceased and, thus, unavailable. However, Arrington has failed to prove that the hearsay testimony is relevant to and probative of a material fact. The alleged rape occurred several months prior to Hutchens's murder, and there was no evidence connecting either the rape or McMahan to it. Moreover, assuming the proffered testimony's trustworthiness, the fact that McMahan had raped the victim in the past did not directly connect him to the victim's murder or show that he committed the murder or a similar crime. "Evidence that merely casts a bare suspicion on another or raises a conjectural inference as to the commission of the crime by another is not admissible." (Citations omitted.) *Watson v. State*, 278 Ga. 763, 771 (10) (604 SE2d 804) (2004). Because the hearsay testimony was not relevant to the crimes for which Arrington was on trial, it was also not relevant to McMahan's motive or interest in testifying and, thus, was not proper impeachment evidence. See *Loomis v. State*, 78 Ga. App. 153, 167 (8) (51 SE2d 13) (1948) (stating that extrinsic evidence used to show that a witness's impartiality is affected by motives arising from interest or bias "must be direct and pointed and not indirect and uncertain"). Therefore, the trial court did not abuse its discretion in refusing to allow the hearsay testimony for either purpose Arrington argues. *Holmes v. State*, 275 Ga. 853, 854 (3) (572 SE2d 569) (2002).

11. At trial, Arrington stated that he had no objections to the admission of photographs of the victim's body and the crime scene and, thus, he has waived any right to complain about them on appeal.

*Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992). Even if Arrington had objected, we would find no abuse of the trial court's discretion in admitting them. *Osborne v. State*, 263 Ga. 214, 215 (2) (430 SE2d 576) (1993).

12. We find no merit to Arrington's contention that certain questions asked by the State during redirect examination of its witnesses and cross-examination of Arrington constituted an attempt by the State to misinform the jury regarding the burden of proof. By questioning the State's witnesses and the defendant regarding the investigation of the case, Arrington opened the door to the prosecutor to question these witnesses and Arrington on the same matters. We do not find that these questions shifted to Arrington the burden of proving his innocence. *Burney v. State*, 244 Ga. 33, 38-39 (4) (257 SE2d 543) (1979).

13. Evidence that Arrington had pleaded guilty to voluntary manslaughter, when charged with killing his wife approximately 15 years prior to the victim's murder, was admitted as similar transaction evidence for the purposes of showing identity and bent of mind. See *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991).

(a) Arrington contends that the admission of this evidence violated his constitutional rights, because at the time of the similar transaction hearing, see Superior Court Rule 31.3 (B), the State had not filed notice of its intent to seek the death penalty against him and, thus, Arrington had not been appointed second counsel as required for defendants in death penalty cases by the Unified Appeal Procedure. See U.A.P. II (A) (1). Because Arrington did not object to the admission of the similar transaction evidence on this ground at trial, this claim is waived. *Patterson v. State*, 280 Ga. 132, 134 (2) (625 SE2d 395) (2006). Even assuming this issue were preserved for appellate review, there is no per se constitutional right to the appointment of two attorneys in a capital case, and Arrington has not shown how he was harmed by being represented by one attorney at the time of his similar transaction hearing.

(b) Arrington also contends that the trial court erred in allowing the admission of evidence relating to the similar transaction, including photographs of the similar transaction victim's body, detailed testimony regarding the crime, and Arrington's conviction and sentence. The State had the burden of establishing the connection between the killing of Arrington's wife and the victim's murder so that proof of his wife's killing tended to establish, by evidence of identity and bent of mind, the commission of the victim's murder. *Stephens v. State*, 261 Ga. 467, 469 (6) (405 SE2d 483) (1991). See *Williams*, 261 Ga. at 643 (2) (d). The photographs established that both victims' bodies were discovered with their clothing pulled up to expose their breasts, and the sentence was admitted to explain that

Arrington was not incarcerated at the time of the murder. We discern no abuse of the trial court's discretion in admitting the similar transaction evidence. See *Sumpter v. State*, 260 Ga. 683, 684 (3) (b) (398 SE2d 12) (1990).

14. Arrington complains that the trial court erred in denying his motion for new trial based on the State's failure to reveal material evidence concerning witness James Griffin's assistance in another murder case in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), and *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972). Under *Brady*, supra, and *Giglio*, supra, a failure to disclose any agreement with a witness, even an informal one, concerning criminal charges pending against that witness constitutes a violation of due process. A review of the motion for new trial hearing shows that Arrington brought forward nothing to contravene the testimony by Griffin, Griffin's attorney, and the state agents involved that they were aware of no express or implied agreement with Griffin or his attorney for Griffin's testimony at Arrington's trial. According to the testimony of the officer investigating the other murder case, Griffin initially provided him with what amounted to a "tip" in that case, and it was not until after Arrington's trial that officers verified the information that Griffin had provided and obtained a taped statement from him.

Nevertheless, Arrington claims the evidence of Griffin's assistance in the other murder case constituted favorable evidence for him under *Brady*, because it would have enabled Arrington to impeach Griffin. To succeed on his *Brady* claim, Arrington is required to show as one component of that claim that a reasonable probability exists that the outcome of the trial would have been different had he possessed the allegedly-suppressed information. See *Schofield v. Palmer*, 279 Ga. 848, 852 (2) (621 SE2d 726) (2005) (listing the requirements of a *Brady* claim). This Court concludes that the additional information that Griffin spoke informally with police about another murder case prior to Arrington's trial would not likely have changed the jury's opinion on Griffin's credibility. The jurors in Arrington's case were aware of Griffin's criminal history through the introduction of his several criminal convictions and sentences for theft and through defense counsel's cross-examination. Arrington also introduced the motions Griffin filed after his sentencing hearing seeking to modify his sentences, and Arrington argued to the jury that, in light of those motions and the fact that Griffin was a convicted felon for theft, a crime involving dishonesty, the jury had reason to question Griffin's credibility when he denied that he was receiving any consideration for his testimony. The trial court instructed the jurors regarding the impeachment of witnesses, including the fact that they were authorized to consider any possible

motive for lying, such as a grant of leniency. Moreover, the record contradicts Arrington's assertion that the allegedly-suppressed evidence disproved facts testified to by Griffin at trial. In light of the foregoing, we conclude that Arrington cannot establish that a reasonable probability exists that the outcome of his trial would have been different if Arrington had been provided the information that Griffin had assisted in another murder case.

15. Arrington contends that the trial court erred in admitting evidence seized from him without a warrant, because the State did not advise him of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1965), prior to obtaining his consent. "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances." (Citation and punctuation omitted.) *Ohio v. Robinette*, 519 U. S. 33, 40 (117 SC 417, 136 LE2d 347) (1996). Whether the accused was advised of his constitutional rights is a factor to be taken into account in determining voluntariness. See *Dean v. State*, 250 Ga. 77, 80 (2) (a) (295 SE2d 306) (1982) (setting forth factors to be considered in assessing the totality of the circumstances). However, it is not a prerequisite to establishing a voluntary consent, as "no single factor is controlling. [Cit.]" Id.

The testimony at the suppression hearing established the following: Arrington was among a group of people outside the victim's residence when the police were investigating the crime scene. When the victim's sister identified those outside as friends of the victim, police requested that the witnesses come to the Criminal Investigations Division (CID) of the Law Enforcement Center to be interviewed. Arrington showed no hesitation in complying with the officers' request. He was transported to the CID in a police car, but he was not shackled or handcuffed. Although police had detected that the sole of Arrington's boot appeared to be similar to a print found inside the victim's residence, the investigator testified that that fact alone did not make him a suspect and that, at the time the witnesses were asked to come to the CID, no one had been identified as a suspect. When Arrington arrived at the CID, he and the other witnesses were interviewed. As with the interviews of the other witnesses, the police asked Arrington general questions about his relationship with the victim, they tape recorded the interview, the interview lasted approximately half an hour, and Arrington was not advised of his *Miranda* rights, because the officers did not consider him to be in custody. Either shortly before or immediately after this interview, the officers asked Arrington to give signed consent to search for biological specimens and to search his person, his clothing, and his residence. The investigator who obtained the consents testified that no threats or promises were made to Arrington, that

Arrington had no questions regarding the forms and never indicated a reluctance to sign them, and that, at the time that Arrington signed the forms, he was not under arrest and was free to leave. He also testified that Arrington did not appear to be under the influence of alcohol or drugs or to be overly tired, and Arrington has not alleged that his age or level of intelligence rendered his consent involuntary.

"Unless clearly erroneous, the trial court's ruling on disputed facts and credibility at a suppression hearing must be accepted on appeal." *Dean*, 250 Ga. at 80 (2) (a). Considering the totality of the circumstances, the trial court's determination that Arrington voluntarily consented to the searches is supported by the evidence, and we find no error.

16. Arrington contends that the State made several improper arguments at the close of the guilt/innocence phase of his trial that require reversal of his conviction and death sentence. We find each of these contentions either to be without merit or to involve matters that resulted in no harm to Arrington, and, therefore, we discern no reversible error.

(a) Arrington's first objection to the State's closing argument came when the prosecutor argued that Arrington had told deputies, "I'm not scared of no bitch. I done killed one bitch. I'll kill another." Defense counsel objected and moved to strike the last sentence, because he did not "believe that was testified to by any deputy." Our review of the transcript shows that a deputy testified that, after he responded to the domestic dispute between Arrington and Hutchens on April 3, 2001, Arrington made the first two statements. However, there was no testimony that Arrington stated that he would kill another. Thus, the prosecutor's remark was a misstatement of the evidence, and the trial court erred in not fulfilling its duty under OCGA § 17-8-75 (providing that, on objection to counsel's statements of prejudicial matters not in evidence, the trial court shall rebuke counsel and instruct the jury "to remove the improper impression from their minds" or order a mistrial).

Such error is subject to harmless error analysis. *Fincher v. State*, 276 Ga. 480, 482 (4) (578 SE2d 102) (2003). The improper statement, consisting of one sentence, was interrupted by defense counsel's prompt objection, and the trial court immediately observed that the "jury w[ould] remember the evidence." The defense raised no additional objection and obtained no additional ruling. Defense counsel reminded the jury during closing argument that the deputy had testified that he considered Arrington's comments "tough-talking" and did not take them seriously and that Arrington had assured the deputies that he would not go back to the victim's home, because he had no intention of returning to prison. Defense counsel also pointed out that the officers did not consider Arrington much of

a threat, because they did not even write a report about his remarks until eight months later. Furthermore, the trial court charged the jury fully as to what constituted evidence, including instructing them that evidence did not include the attorneys' opening statements or closing arguments. All things considered, including the strength of the State's evidence in this case, we conclude that it is highly probable that the trial court's error in failing to comply with OCGA § 17-8-75 did not contribute to the verdicts.

(b) The prosecutor's remark that Arrington hoped that the jury would not apply the law was permissible as a reasonable inference that could be drawn from the evidence, because Arrington acknowledged on cross-examination that he had argued with the victim close to the time of her death, that he had made derogatory remarks about her to the police, that his bloody fingerprint and bloody boot prints were in her apartment because he had been there and had walked around her dead body, that he did not have an alibi defense, and that the State had presented "pretty much a carbon copy" of the facts in this case as in his wife's killing for which he had pleaded guilty to voluntary manslaughter. See *Miller v. State*, 275 Ga. 730, 738-739 (7) (571 SE2d 788) (2002).

(c) Arrington's contention that the prosecutor made numerous burden-shifting remarks is without merit. A prosecutor may argue that the defendant has not rebutted or explained the State's evidence. See *Pearson v. State*, 277 Ga. 813, 815 (3) (596 SE2d 582) (2004); *Johnson v. State*, 271 Ga. 375, 383 (15) (a) (519 SE2d 221) (1999). It is also permissible for a prosecutor, in closing argument, to "urge the jury to draw reasonable deductions from a defendant's failure to produce purportedly favorable witnesses." *Miller*, 275 Ga. at 739 (7). Moreover, the trial court instructed the jury that the State has the burden of proving the defendant guilty and that the burden never shifts to the defendant to prove his innocence.

(d) We also find no merit to Arrington's contention that, because it was admitted only for the record, it was improper for the prosecutor to comment regarding a tape recording of Arrington's first interview. Our review of the transcript shows that, after a proper foundation was laid, the tape recording was played before the jury. Moreover, during the prosecutor's argument, the trial court instructed the jurors that they were to remember what was on the tape recording and that they were not to infer something was on the recording that they did not hear. We find no error here. See *Wyatt v. State*, 267 Ga. 860, 864 (2) (a) (485 SE2d 470) (1997) (stating that "the prosecutor has wide latitude to argue inferences from the evidence").

(e) Contrary to Arrington's contention, the State was entitled to comment on the similar transaction involving the voluntary man-

slaughter of his wife, because this transaction was properly admitted at trial. See, e.g., *Davis v. State*, 264 Ga. App. 128, 136 (7) (b) (589 SE2d 700) (2003).

(f) When Arrington objected to the prosecutor's argument that an acquittal "would say that Arrington was honest and had nothing to hide," the trial court required the prosecutor to acknowledge to the jury that this was not what a verdict of "not guilty" meant, and the prosecutor voluntarily moved on from the argument. We find no harm.

(g) Arrington contends that the prosecutor made improper personal attacks on defense counsel. The prosecutor used a demonstrative aid purportedly depicting "defense tactics" and argued that defense counsel were "backed in a corner because of the guilt of their client" and "did not want to delve into the inconsistencies and try to explain [them]." The trial court instructed the jury to disregard the prosecutor's remarks because they were not proper, strongly rebuked the prosecutor outside the presence of the jury, and directed that the demonstrative aid be removed. Assuming, but not deciding, the impropriety of the prosecutor's comments, see *Gissendaner*, 272 Ga. at 713 (10) (a), we find that, under the circumstances, the trial court did not abuse its discretion in denying Arrington's motion for a mistrial based on the prosecutor's comments. See *Brown v. State*, 268 Ga. 455, 456 (1) (490 SE2d 379) (1997).

(h) Finally, Arrington argues that the prosecutor's remark that Arrington's conviction "would say enough to this dual killer," in conjunction with the State's demonstrative aid indicating that he was a "mass killer," constituted an improper future dangerousness argument at the guilt/innocence phase of the trial. See *Wyatt*, 267 Ga. at 864 (2) (b). When Arrington objected to the demonstrative aid, the trial court instructed the jury to disregard it. However, the objection now made was not raised at trial, and thus has been waived insofar as it concerns the jury's determination of Arrington's guilt. See *Gissendaner*, 272 Ga. at 713 (10) (b). Moreover, we do not interpret the prosecutor's remark in this case as an argument that the defendant posed a threat of future dangerousness if not found guilty, see *Fulton v. State*, 278 Ga. 58, 65 (8) (597 SE2d 396) (2004), but as a reasonable inference from the evidence. A guilty verdict for the commission of Hutchens's murder would make Arrington a dual killer, because, as the similar transaction evidence showed, he had previously pleaded guilty to the commission of voluntary manslaughter. See *Wyatt*, 267 Ga. at 864 (2) (a) (stating that "the prosecutor has wide latitude to argue inferences from the evidence"). Nevertheless, when a death sentence has been imposed, this Court must also consider whether that sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35

(c) (1). "In doing so, we consider whether any allegedly-improper arguments that were not objected to at trial in reasonable probability changed the jury's exercise of discretion in choosing between life imprisonment or death." (Citations and punctuation omitted.) *Gissendaner*, 272 Ga. at 713 (10) (b). Even assuming that the prosecutor's comment was improper, we conclude that there is no reasonable probability that it affected the jury's exercise of discretion in determining Arrington's sentence.

### *Sentencing Phase Issues*

17. Arrington testified in the sentencing phase, and on cross-examination the trial court allowed the prosecutor to elicit testimony showing that Arrington had pleaded nolo contendere and guilty, respectively, to two prior family violence battery charges.[3] Arrington contends that the trial court erred in overruling his objections to this testimony on the grounds that the State did not give the notice required by OCGA § 17-10-2[4] and that the convictions were uncounseled. The State argues that the notice provisions of OCGA § 17-10-2 were inapplicable, because the convictions were not admitted as evidence in aggravation but as rebuttal evidence. See, e.g., *Buttrum v. State*, 249 Ga. 652, 655-656 (9) (293 SE2d 334) (1982). After Arrington testified that his volatile relationship with his former wife was "our way of life" and that his killing of her was "an accident" and "a reaction," the State cross-examined Arrington regarding the family violence batteries. When a criminal defendant testifies in his own behalf and falsely denies past criminal conduct or misdeeds, the State may introduce evidence of a prior conviction to "prove[ ] the falsity of specific testimony of the defendant." *Jones v. State*, 257 Ga. 753, 759 (a) (363 SE2d 529) (1988). Such evidence constitutes impeachment evidence rather than character evidence. See *Williams v. State*, 257 Ga. 761, 762-763 (4) (d), (5) (363 SE2d 535) (1988). However, assuming without deciding that the evidence of Arrington's prior convictions constituted proper impeachment evidence, we conclude that the trial court erred in denying Arrington's objection to the admission of this evidence based on the validity of the convictions. See, e.g., *Morgan v. State*, 235 Ga. 632 (221 SE2d 47)

---

[3] Certified copies of the actual convictions were admitted for the record only and did not go out with the jury.

[4] Because Arrington's trial took place prior to July 1, 2005, the statute applicable to his case was OCGA § 17-10-2 as it read prior to its 2005 amendment, which provided that "only such evidence in aggravation as the state has made known to the defendant prior to the defendant's trial shall be admissible." OCGA § 17-10-2 (a). See 2005 Ga. L., p. 29, § 17 (providing that the 2005 amendment applies "to all trials which commence on or after July 1, 2005").

(1975) (remanding for resentencing where, during the sentencing phase of a murder trial, the State introduced two prior misdemeanor convictions of the defendant obtained without counsel). See also Goger, Daniel's Georgia Criminal Trial Practice (2008 ed.), § 26-8.

Once Arrington raised the issue of the validity of his prior convictions, the State bore the initial burden of proof regarding their validity. *Pope v. State*, 256 Ga. 195, 209-210 (17) (345 SE2d 831) (1986), overruled on other grounds by *Nash v. State*, 271 Ga. 281 (519 SE2d 893) (1999). As the State failed to carry this burden, the trial court erred in admitting evidence of the prior convictions, and we thus turn to the question of harm. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U. S. 18, 24 (III) (87 SC 824, 17 LE2d 705) (1967). Reversal is required where there is "a reasonable possibility" that the improperly admitted evidence contributed to the verdict. *Schneble v. Florida*, 405 U. S. 427, 432 (92 SC 1056, 31 LE2d 340) (1972) (citing *Chapman*, 386 U. S. at 24). See also *State v. Hightower*, 236 Ga. 58, 60-61 (222 SE2d 333) (1976).

A review of the record shows that, after the State introduced evidence of the convictions, the State procured, at Arrington's request, the appearance of Ashley Seps, who was the victim in both batteries. Thus, the State could, and likely would, have put Seps on the stand in rebuttal to testify about the underlying conduct that led to the convictions had the trial court sustained Arrington's objection to the State's questions to him about his convictions for those batteries. See *McMichen*, 265 Ga. at 607 (12) (stating that evidence of a defendant's character is admissible in the sentencing phase of a death penalty trial). Seps, testifying on behalf of the defense, stated that during her approximately three-year relationship with Arrington, he only struck her twice. Neither incident was the type of brutal, prolonged attack that had been inflicted on the murder victim. In fact, neither of Seps's injuries required medical treatment, and, in both instances, Arrington, who had been drinking at the time, freely admitted to police that he had caused Seps's injuries and accepted the consequences of his actions. Seps also testified that prior to living with Arrington she was aware that he had pleaded guilty to voluntary manslaughter for his wife's killing, that she was never in fear of him, that he cooked, helped with the household chores, and contributed financially to the household, and that, when he was sober, he was nice and loving toward her and was "very docile and calm." She also testified that Arrington worked at odd jobs while he lived with her and that she never gave him any money.

Seps's testimony supported the defense's arguments that Arrington had always been quick to admit his violent acts and that those acts were the result of his alcoholism, and it undermined the State's attempt to show that Arrington had exhibited a pattern of committing domestic abuse and of financial dependence on women. Moreover, defense counsel used Seps's testimony to argue that life without parole was the appropriate sentence for Arrington, because Seps's testimony showed that he was not "intrinsically evil" or "a serial killer." Considering Seps's testimony regarding the underlying conduct supporting the convictions, the overwhelming evidence of the statutory aggravating circumstances supporting the death penalty in this case, and the fact that the jury was authorized to consider the similar transaction evidence at the sentencing phase, see *O'Kelley v. State*, 284 Ga. 758, 766 (3) (670 SE2d 388) (2008), we conclude that the admission of the evidence of the actual convictions was harmless beyond a reasonable doubt.

18. When, during closing argument, the prosecutor began a hypothetical vignette involving Arrington's killing a female prison guard, defense counsel objected on the ground that there was no evidence that Arrington had ever been a security risk while incarcerated. The trial court properly sustained Arrington's objection and gave a curative instruction to the jury to disregard the vignette. See *Henry v. State*, 278 Ga. 617, 619-620 (1) (604 SE2d 826) (2004) ("[I]t is improper for the State to argue that a defendant will kill in prison simply because he killed while free."). We discern no abuse of the trial court's discretion in its denial of Arrington's motion for a mistrial. See *Flowers v. State*, 252 Ga. 476, 479 (2) (314 SE2d 206) (1984).

In addition to the foregoing, Arrington complains about portions of the prosecutor's opening statement and closing argument that, with one exception, were not objected to at trial. We have reviewed the transcript, and we find no reversible error. See *Parker v. State*, 277 Ga. 439, 442 (2) (588 SE2d 683) (2003) (stating that, even where counsel objects, uncorrected argument of counsel does not require reversal where it is highly probable the improper argument did not contribute to the verdict); *Gissendaner*, 272 Ga. at 713 (10) (b) (stating that, in cases where the death penalty has been imposed, this Court considers whether any allegedly-improper arguments not objected to at trial in reasonable probability changed the jury's exercise of discretion in choosing a sentence).

### Sentence Review

19. The jury found the existence of the following statutory aggravating circumstances beyond a reasonable doubt: the murder

was committed while Arrington was engaged in the commission of the capital felony of armed robbery, and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. See OCGA § 17-10-30 (b) (2), (7). The evidence in this case revealed that Arrington initially attacked Hutchens, who was disabled, in the confined area of the bathroom, where he struck her multiple times shortly after she emerged from the shower. According to blood spatter pattern analysis, Hutchens then staggered into the living area. Although she was apparently too stunned to attempt to defend herself, as she sustained no defensive injuries, Arrington continued his attack on her even as she fell to the floor. The evidence showed that he struck Hutchens in the head with a hammer and a metal stool at least 12 to 14 times with sufficient force to cause the skull to "cave in on itself" and to be "essentially punched into the cranial cavity" and that he acted for the purpose of obtaining the money she had just received from cashing her disability check. Viewed in the light most favorable to the verdict, this Court finds that the evidence adduced at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of the statutory aggravating circumstances in this case. *Jackson*, supra, 443 U. S. 307; OCGA § 17-10-35 (c) (2). See *Davis v. State*, 255 Ga. 598, 612 (20) (340 SE2d 869) (1986); *Hance v. State*, 245 Ga. 856, 861-862 (3) (268 SE2d 339) (1980).

20. Upon a review of the trial record, this Court concludes that Arrington's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1).

21. The cases in the appendix support the imposition of the death penalty in this case in that all involve a deliberate murder involving an armed robbery or depravity of mind and, thus, show the willingness of juries in Georgia to impose the death penalty under such circumstances. Considering the crime and the defendant, we find that the sentence of death in Arrington's case is not disproportionate punishment. See OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur, except Benham, J., who concurs in judgment only as to Division 9.*

APPENDIX.

*O'Kelley v. State*, 284 Ga. 758 (670 SE2d 388) (2008); *Sealey v. State*, 277 Ga. 617 (593 SE2d 335) (2004); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Fults v. State*, 274 Ga. 82 (548 SE2d 315) (2001); *Butts v. State*, 273 Ga. 760 (546 SE2d 472) (2001); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Bishop v. State*, 268 Ga. 286 (486 SE2d

887) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994); *Potts v. State*, 261 Ga. 716 (410 SE2d 89) (1991).

DECIDED NOVEMBER 9, 2009 —
RECONSIDERATION DENIED DECEMBER 15, 2009.

*William J. Sussman, Jeffrey S. Bowman*, for appellant.
*Ashley Wright, District Attorney, Charles R. Sheppard, Assistant District Attorney, Thurbert E. Baker, Attorney General, Theresa M. Schiefer, Assistant Attorney General*, for appellee.