## A10A1985. HALL v. THE STATE.
(710 SE2d 146)

BARNES, Presiding Judge.

Antone Cortez Hall appeals his conviction of battery and two counts of robbery by force against two different victims, contending that the trial court erred in denying his motion to suppress evidence recovered after he was seized. He also asserts that the trial court erred in admitting both victims' pretrial identification of him and one victim's in-court identification. Having reviewed the record and the transcripts of the motions hearing and bench trial, we find no error.

1. When reviewing a ruling on a motion to suppress, we accept a trial court's findings as to disputed facts unless the findings are clearly erroneous, but if the evidence is uncontroverted and no issue of witness credibility exists, as is the case here, we review de novo the trial court's application of the law to undisputed facts. *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

The record shows that in November 2007, a cab driver who spoke only Spanish picked up two men from a mobile home park, one white, one African-American. The driver recognized the white man, who sat in front, because he had been a passenger before. The driver took the men to a specific location, waited, drove them to another location, and waited again. Upon their return, the men asked the driver to take them back to the mobile home park, and the driver agreed but was suspicious and asked for payment first of the money owed to that point. The men said no, they would pay him when they got back to the park. The man in the back seat grabbed the driver by the neck and demanded money while the man in the front began hitting him. The driver opened his door and tried to run out, but the man in back caught him, and both passengers began hitting the driver, then kicked him when he fell to the ground. The driver finally gave them the cash from his pocket, less than $200, and they left. The driver called a co-worker, who called the police, who came and investigated the crime.

Several weeks later, the driver began talking to another cab driver who had been robbed earlier that day by two men, one white, one African-American, whom she had picked up from the same mobile home park. The method of the crime was very similar, and the first driver thought the robbers might be the same men that robbed him. Some time later he saw an article in a Spanish newspaper about two men who had been arrested for robbing a cab driver, and he recognized the men from the newspaper photographs as the men who had robbed him. The photographs were of Hall and Frankie Andrew Clark, also charged with these crimes, and the driver took the article to the police to show them. At trial, however, the driver

could not positively identify Hall as the man who had robbed him.

In December 2007, a different cab driver picked up two passengers, a white man and an African-American man, from the same mobile home park around 3:00 a.m. The driver became suspicious when the white man directed his companion to sit directly behind the driver and then got into the front passenger seat himself. When the men did not know the specific address of their destination, the driver became nervous and retrieved her Taser from her door pocket. She turned it on and concealed it on her lap beneath her shirt. When the man in front directed her to turn into a particular driveway, the driver commented that she did not know that the woman who lived there, who was a friend of hers, was expecting company. The man corrected himself and said his destination was further down, so the driver backed out of the driveway and continued down the road, turning around twice in response to the front passenger's directions.

When the driver rounded a curve on the main road, the front passenger suddenly reached over and threw the cab into park, then yelled for the back passenger to grab and hold the driver. The front passenger struck the driver on the head with a hard shiny object, and she fought back, knocking the object from his hand, scratching his neck, and tasing him as he continued to strike her with his fists. She tased the back passenger's right hand too, and he let go and ran away. The front passenger finally grabbed the driver's wallet from her door pocket and ran up a driveway behind a house, toward a wooded area in the same direction the back passenger had gone.

During the altercation the driver had been on the radio with her dispatcher, who had been on the line with a 911 operator, and within five minutes law enforcement officers met the cab driver at a nearby parking lot. While looking through the cab, the first responding detective found a meat cleaver on the floor between the two front seats, which the driver thought was the hard shiny object she knocked out of the front seat passenger's hand. The driver described the back passenger as a younger-looking African-American man, thin with a small frame, "shorter than the white guy," wearing all dark clothes, including a winter jacket and a "toboggan" hat. The victim pointed out the direction the two men had gone.

The county sheriff's department set up a perimeter around the area where the robbery took place, covering the "most obvious outlets" from the wooded area near the robbery, and a canine unit began searching for the men. It was still dark, around 3:00 or 4:00 a.m., and there were no pedestrians or traffic in the area. The officers were about to call off the search when a newspaper delivery man drove up and said he almost hit "a white male and a black male" running down the road in a nearby subdivision. The delivery man stopped to tell the officers about it because he thought they might be

looking for someone. Officers went to search that area about a quarter of a mile away.

One of the officers was driving 25 to 30 mph down the road when he passed Hall, who was heading in the opposite direction on the left side of the road. The deputy noticed that Hall was extremely slender and dressed in all black. Although he was sweating profusely and out of breath, he was not sufficiently dressed for the very cold weather, and the deputy detained him for further investigation. Hall said first that he was coming from his cousin's house, but then said he was going to his cousin's house (which he could not describe) and was coming from his home at the trailer park miles away. This explanation further aroused the deputy's suspicion because Hall would have had to pass through the officers' perimeter to have come from the trailer park, and they had not seen him do so. As he had not walked through the perimeter, he must have come from the woodline, the deputy reasoned, because there were no through streets within the area being monitored, only small subdivision streets which were all under surveillance.

The deputy explained to Hall that he was not under arrest but was being detained because he fit the description of someone involved in a "nearby scene." After patting him down and placing him in handcuffs, the deputy placed Hall in the back of a patrol car and took him to a nearby lighted parking lot, where he directed Hall to get out and stand in the lot. The victim viewed Hall from the back seat of a patrol car that drove by Hall twice, but could not identify him with certainty, so the officers uncuffed him and were obtaining contact information when other officers located the second robber, Clark. Clark fit the description of the white male robber, including fresh scratches on his neck, and upon his apprehension the officers decided to arrest Hall.

Hall moved to suppress any evidence derived from his seizure, specifically his responses to the officer's questions and the second victim's identification of him at the scene, asserting that the deputies lacked reasonable suspicion to justify the investigatory detention. Momentary detention and questioning is legal if the stop is "based upon specific and articulable facts, which, taken together with rational inferences from those facts, justify a reasonable scope of inquiry not based on mere inclination, caprice or harassment." *Buffington v. State*, 228 Ga. App. 810, 811 (492 SE2d 762) (1997). While the victim's description of her assailants was not very specific, Hall matched the description in build, height, race, and clothing color. With the assistance of a tip from a concerned citizen, Hall was found at 3:00 or 4:00 a.m. within walking distance of the crime shortly after it was committed, within the perimeter law enforcement officials had established. There were no other pedestrians or

traffic in the area. Hall was out of breath and sweaty despite being underdressed for the weather, and he gave conflicting accounts of where he was coming from and going. Based on the totality of the circumstances, the investigatory stop was based on reasonable suspicion arising from a particularized and objective basis for suspecting Hall of criminal activity. Therefore, the trial court did not err in denying Hall's motion to exclude evidence obtained as a result of his detention.

While Hall baldly asserts in a footnote that he was both seized and arrested, he neither argues the point nor cites authority for this proposition. Having failed to support this contention with facts or law, we will not discuss in any depth Hall's assertion that he was arrested without probable cause when first detained, but simply point out that a second-tier investigatory stop is not automatically an arrest simply because an officer is armed or the suspect is hand-cuffed. See *Lewis v. State*, 294 Ga. App. 607, 609 (1) (a) (669 SE2d 558) (2008).

2. Hall contends that the trial court erred in admitting the second cab driver's identification of him as one of the robbers, arguing that the on-scene identification was inherently suggestive and tainted the in-court identification. "An identification procedure becomes impermissibly suggestive when it leads the witness to an all but inevitable identification of the defendant as the perpetrator, or is the equivalent of the authorities telling the witness, 'This is our suspect.' " (Citation and punctuation omitted.) *Williams v. State*, 272 Ga. 828, 828-829 (2) (537 SE2d 39) (2000). In determining whether the procedure was impermissibly suggestive, we consider the totality of the circumstances, including the witness's opportunity to observe the criminal during the crime, her degree of attention, the accuracy of her prior description, her level of certainty at the confrontation, and the length of time between the crime and confrontation. *Thomason v. State*, 268 Ga. 298, 303-304 (3) (486 SE2d 861) (1997).

Here, the cab driver picked up Hall and Clark by the mobile home park office, which was well lit by a street light directly overhead, and she looked at both men then. As a precaution, she automatically looked closely at all her passengers "[i]n case we need to give a description in case something like this happens. We always try to at least know who is in our car," she said. She became suspicious of them almost immediately when Clark directed Hall to sit behind her and then got in the front passenger seat, and focused on them more than usual until the assault about ten minutes later. She looked at Hall when using her wide-angle rearview mirror, which she did off and on during the drive. She accurately described to officers Hall's race, gender, demeanor, physical stature, and clothing,

and was "pretty sure" it was him when she saw him standing by the police car. Finally, Hall was arrested soon after the robbery in a location very close by. Considered as a whole, this pretrial identification procedure was not unduly suggestive and did not create a substantial likelihood of misidentification. Accordingly, the trial court did not err in admitting the cab driver's pretrial identification of Hall. Further, the victim made no reference to her pretrial identification when she said at trial that Hall was "the gentleman that was in [her] car that night," and the trial court did not err in admitting her in-court identification of Hall.

3. Hall contends that the trial court erred in allowing into evidence his pretrial identification from the newspaper photographs by the victim of the first robbery, arguing that it was "suggestive," particularly in light of the victim's extremely general description of his attackers. As the State points out, however, "for the Fourteenth Amendment to come into play in an identification procedure, state action must be involved." *Lyons v. State*, 247 Ga. 465, 467 (277 SE2d 244) (1981). Although the officer investigating this robbery had prepared a photographic lineup for the victim to view, when he came to the station and showed the newspaper photographs to her, the officer decided not to show him the other photographs because he had already identified Hall. The pretrial identification at issue here involved no state action, and therefore raises no Fourteenth Amendment issues. The reliability of this victim's pretrial identification was simply a question of his credibility for the trier of fact to determine. Id. Thus, the trial court did not err in admitting into evidence the victim's identification of Hall from the newspaper article.

*Judgment affirmed. Blackwell and Dillard, JJ., concur.*

DECIDED MARCH 16, 2011 —
RECONSIDERATION DENIED APRIL 11, 2011.

*Jennifer A. Trieshmann*, for appellant.
*Lee Darragh, District Attorney, Wanda L. Vance, Assistant District Attorney*, for appellee.